# Appendix 1

1   **TRANSCRIBED FROM DIGITAL RECORDING**

2                   IN THE UNITED STATES DISTRICT COURT
                    NORTHERN DISTRICT OF ILLINOIS
3                         EASTERN DIVISION

4   DAVID MACK and CHRISTOPHER MACK, on   )
    behalf of themselves and other        )
5   similarly situated, and KIMBERLY      )
    HOVANEC,                              )
6                                         )
                Plaintiffs,               )
7                                         )
                vs.                       )   No. 10 C 4244
8                                         )
    MRS ASSOCIATES, INC.,                 )   Chicago, Illinois
9                                         )   February 25, 2011
                Defendant.                )   9:49 A.M.
10
                    TRANSCRIPT OF PROCEEDINGS - Ruling
11        BEFORE THE HONORABLE ARLANDER KEYS, Magistrate Judge

12  APPEARANCES:

13  For the Plaintiffs:        BURKE LAW OFFICES, LLC
                               155 North Michigan Avenue
14                             Suite 9020
                               Chicago, Illinois  60601
15                             BY:  MR. ALEXANDER HOLMES BURKE

16  For the Defendant:         HINSHAW & CULBERTSON
                               222 North LaSalle Street
17                             Suite 300
                               Chicago, Illinois  60601-1081
18                             BY:  MR. JAMES CONSTANTINE VLAHAKIS

19
                        PAMELA S. WARREN, CSR, RPR
20                        Official Court Reporter
                         219 South Dearborn Street
21                            Room 1928
                         Chicago, Illinois   60604
22                           (312) 294-8907

23  **NOTE:  Please notify of correct speaker identification.**
    **FAILURE TO SPEAK DIRECTLY INTO THE MICROPHONE MAKES PORTIONS**
24  **UNINTELLIGIBLE.**

25

(Proceedings held in open court:)

THE CLERK:  10 C 4244, Mack versus MRS Associates, ruling.

THE COURT:  Good morning, counsel.

MR. VLAHAKIS:  Good morning, your Honor.  James Vlahakis, V as in Victor, l-a-h-a-k-i-s, on behalf of defendant.

THE COURT:  Good morning, Mr. Vlahakis.

MR. BURKE:  Good morning, Judge.  Alexander Burke for the plaintiff.

THE COURT:  Good morning.

Okay.  I received your response to the plaintiff's motion to compel, Mr. Vlahakis, and -- well, I'm -- I have gone through it, and -- how should I say it? -- not that impressed with your argument here.  I have seen this argument many times before in other cases of this court.  And while it is understandable -- the real issue here is whether these people gave consent to your client to contact them by cell phone.  Right?

MR. VLAHAKIS:  Yes and no.  I think the issue is whether they provided consent to the underlying creditor, including Capital One, which would be transferrable to my client, or whether during the collection process, after MRS initiated the collection calls and collection letters, whether that debtor then contacted MRS and consented to being called

1    via cell phone.

2         I do appreciate you giving me the opportunity to

3    respond in writing.  I do think a distinction with at least the

4    Pipe decision that you ruled on before, was the Seventh Circuit

5    case in -- and I'm probably going to mangle the pronunciation

6    of it, Cheverit or we can call it the Williams Pipe case.

7         THE COURT:  Right.

8         MR. VLAHAKIS:  That would relate to the first

9    component that I discuss where the consent to call on the cell

10   phone may have been provided to, in this instance, Capital

11   One.  And if the (unintelligible) reached out to Capital One --

12   I have told under -- in no uncertain terms, you need to issue a

13   subpoena because we're not going to voluntarily provide those

14   records to you.

15        As it relates to what records MRS may have, Mr. Burke

16   has been very cooperative with me.  We have tried to work

17   things out.  I had proposed a rolling production of placement

18   notes which would assist us -- when I say us, both parties --

19   in showing what numbers were received initially from Cap One

20   and then other creditors to show that we did at least get

21   numbers coming in, and that we didn't necessarily skip trace

22   them.

23        The more difficult issue with just the MRS consent

24   issues, then Mr. Burke has asked for collection notes, which

25   may or -- excuse me -- may or may not demonstrate consent.  So

1   for each individual count, we would have to go and say, okay,

2   did this person call in just some kind of coded message that

3   the collector has for that.

4           I have tried to discuss that with my client, that

5   maybe we should sort of produce these records.  I'm in a very

6   difficult situation right now because there is another case

7   pending in this district that is -- there is a pending motion

8   for reassignment that's being litigated by a different law firm

9   who is operating under a different insurance policy.  I was

10  just told -- Thursday?  Wednesday?

11          MR. BURKE:  This week.

12          THE COURT:  Is this your case, Mr. Burke?

13          MR. BURKE:  No, it is -- believe or not it is my old

14  boss Keith Kehoe's case.

15          THE COURT:  All right.

16          MR. VLAHAKIS:  Well, anyway, I get a phone call, and

17  it is from the Sessions law firm, and they said that --

18  although I hadn't heard this from CNA Insurance, which employed

19  me -- that that Sessions law firm is going to be taking over

20  both of these cases.

21          Now what's difficult about that is Alex and I were

22  trying to work out, well, what can we do about the production

23  in a timely manner on a rolling basis of (unintelligible) the

24  collection.

25          I do understand his point, at least with regard to the

1    internal documents.  We may have to do some gymnastics to be

2    able to cull through those and demonstrate consent, but I

3    believe that we are willing to do that.  I just don't have

4    authority to do that right now.

5         If this Court is ruling on this issue -- two issues,

6    as I see it, what can MRS produce that it has control over,

7    that's something that, you know, we're willing to look into.

8         The other issue I believe that this Court cannot do,

9    respectfully, is order us, MRS, to produce records that it has

10   been told by Cap One we can't have access to, meaning Cap One's

11   internal collection notes.

12        I have been --

13        THE COURT:  Why don't you subpoena Cap One?

14        MR. VLAHAKIS:  Yes.

15        THE COURT:  And if they don't produce them why -- file

16   a motion to show cause why they should not be held in contempt.

17        MR. VLAHAKIS:  And that's what I --

18        THE COURT:  I bet that will get their attention.  But

19   it is not going to help your client because your client

20   is -- they are your client's customer.

21        MR. VLAHAKIS:  Yes.  I understand.

22        THE COURT:  I know you don't want to do that.

23        MR. VLAHAKIS:  But we are going to do that.

24        THE COURT:  Okay.

25        MR. VLAHAKIS:  And if -- with the caveat that I am

1    representing MRS at this day, without being told by CNA you're

2    done with the case, I'll be issuing a subpoena in --

3    probably on Monday.

4              THE COURT:  Okay.

5              MR. VLAHAKIS:  I assume that that's probably the same

6    approach that the new attorneys are going to take, if they jump

7    into the case at this juncture.

8              But the issue is then, okay, we'll be doing that.  I

9    think that might moot out that issue of the motion to compel.

10             I guess what's left right now is what time frame

11   Mr. Burke would agree to for the placement notes, which I would

12   propose on a 30-day rolling basis.

13             I can probably get that stuff sooner.  What I have

14   talked to Mr. Burke about is, first, from an ESI standpoint,

15   what format does he need to see those records in so at least he

16   will have something that's readable.

17             I have been told that the placement records that he

18   may receive are going to be in the number probably -- over the

19   class period 10 million placement records.

20             THE COURT:  Uh-huh.

21             MR. VLAHAKIS:  And we're going to have to be able to

22   figure out something on that.

23             I need to reconfirm to make sure that's the number.

24   But that's what I am being told.  But my question probably got

25   sent down the line to three or four people, so making sure it

1    didn't get mangled in translation, that that is the number.

2          If it is a smaller number, great.  But we will be

3    producing that.

4          But the other issue then I think really remains is

5    what does this Court want to do with regard to the production

6    of the internal collection notes.  I have had difficulties in

7    cases with Mr. Burke where he's tried to work these things out

8    with me, where we tried to find a search protocol that helps us

9    find something better.  And we were outside in the hall still

10   trying to work on that.

11         So I don't know if it is an issue of, you know,

12   entering and continuing this to allow us to see -- I see him

13   shaking his head, and I understand his point -- what we can do

14   to be able to whittle this down.  Because, obviously, from a

15   numerosity standpoint, he wants to know does he have enough

16   people to be able to certify a class.

17         And I think that there is a -- there are more than 40

18   people clearly who did not provide their consent to Cap One or

19   to MRS.  The issue then gets into the entanglement of Rule 23

20   when we have to do sort of the mini trial within the mini trial

21   of who provided consent for all of these millions of records.

22   That may suggest a class certification isn't proper because all

23   the work would have to have been done after the class is

24   certified, and --

25         THE COURT:  Mr. Burke will probably argue that he

1  believes that none of them provided consent.  The burden is on

2  you to prove that they did.

3      MR. VLAHAKIS:  I agree that the -- yeah, he's argued

4  that the burden is on us.

5      THE COURT:  And I'll agree with you again that you are

6  probably going to find some that consented.  But the burden has

7  been on you, you're the one that raised the affirmative defense

8  of consent.  And since you raised that issue, then the

9  plaintiff has the right to get the records or the documents to

10 show that who did consent and who didn't.

11      I know it is probably millions of people, at least

12 hundreds of thousands of people more than likely, right?  Or

13 thousands.

14      MR. VLAHAKIS:  Yes.  Well, here's one way of looking

15 at it then.  I think maybe the client doesn't need to go

16 through its own internal records to determine this issue, it

17 may be an issue of what records Cap One can provide to us.

18 Because if Cap One is providing, for instance, applications

19 that show the numbers, in this case what with Mr. Mack,

20 Christopher Mack, and Julie Mack, they did fill out

21 applications, but it turns out that those numbers were either

22 landlines or lines they no longer used.

23      So to the extent we called because those numbers were

24 provided to Cap One, those weren't the cell phones at issue.

25      So we got numbers from other sources, as I understand

1    things, that demonstrate there was not a consent for Chris and

2    Julie at this point.  I'm still trying to find out if there was

3    complete compliance from Cap One.

4            But there has got to be a way, I think, from what Cap

5    One can produce to us to say, Cap One, here's the placement

6    notes.  We have those.  Here's something that Cap One has on

7    their files and maybe cull through a small subset of that to

8    start finding out why -- whether through sampling or something,

9    that there is going to be definable class.

10           And at a certain point potentially saying stop, if he

11   has enough numbers.

12           MR. BURKE:  On page 4 of our motion, Judge --

13           THE COURT:  Uh-huh.

14           MR. BURKE:  -- we quote three of the interrogatories

15   that we're moving to compel.

16           THE COURT:  Okay.  Go ahead.

17           MR. BURKE:  The first interrogatory, Number 5, asked

18   them to give us a list of everybody that they didn't get the

19   phone number from the owner of the cell phone.

20           Number 6 asks for what source --

21           THE COURT:  Did you obtain --

22           MR. BURKE:  -- did they get the number.

23           7 says, all right, well, if you claim that any of

24   those people in the previous two interrogatories provided

25   consent, tell us how -- why you think that.

1          I think that this -- you know, we're not just asking

2     for all the records.  We have sort of refined this even since

3     (unintelligible), and it should be -- you know, it is -- I

4     think it is more -- it is more focused.  It is going to give me

5     a better result.  It is going to tell me precisely who is in my

6     class, and --

7          THE COURT:  And that is certainly narrower --

8          MR. BURKE:  Yes.

9          THE COURT:  -- than your request in (unintelligible).

10         MR. BURKE:  Yes.

11         THE COURT:  All right.

12         MR. BURKE:  And this has been -- we had a

13    corresponding document requests that ask for the documents, you

14    know, relating to these groups of people.

15         For example, with respect to 7, all right, well, you

16    contend that there are documents that show that these people

17    consented, produce them.

18         So I think that defense counsel is proposing that they

19    just produce a bunch of stuff.  You know, the placement

20    records.  And we would be happy to receive the placement

21    records, but we want to know -- I mean, these are contention

22    interrogatories.

23         THE COURT:  Uh-huh.

24         MR. BURKE:  Discovery ends in May.  And it has been

25    open since the summer.  We issued these requests in the summer,

 1    first day possible, and we have been discussing these issues

 2    since then.

 3          I would request that the defendant be compelled to

 4    produce responses to these interrogatories and document

 5    requests --

 6          THE COURT:  To the best of their ability.

 7          MR. BURKE:  -- to the best of their ability within 30

 8    days --

 9          THE COURT:  And if their answer is, we don't have the

10    information, we tried to get it from Capital One.

11          MR. BURKE:  Well, I would -- I mean, I think we're

12    entitled to try to get it, but I don't think they are going to

13    get it.  But if they get it --

14          THE COURT:  Through a subpoena they would probably get

15    it.

16          MR. BURKE:  That would be fine with me.

17          You know --

18          THE COURT:  But at the same time you don't want

19    to -- they don't want, as Capital One is their client, their

20    customer they don't want to upset Capital One with a subpoena.

21    But sometimes you have to do that.

22          MR. VLAHAKIS:  I understand that.

23          THE COURT:  All right.

24          MR. VLAHAKIS:  I think -- the point of this being a

25    contention interrogatory and discovery closing in May, I think

 1    we should be entitled to more time.  I understand he issued it

 2    issue, but we -- we fought over it.  We had, you know, spirited

 3    but professional discussions over what we can produce.  And in

 4    light of the looming class cert deadline, which he pushed on

 5    himself, he had to move to compel.

 6           I understand that in these kinds of cases that a class

 7    cert motion is filed, and that the day the complaint is filed

 8    something doesn't happen to (unintelligible).

 9           I understand though that in doing so, we put ourselves

10    under time constraints.  For instance, Judge Hibbler then

11    struck the motion for class certification a few weeks ago

12    saying it is been on my docket too long.

13           I have seen cases out there saying that once that

14    class cert is filed, then that could preclude the Rule 68 pick-

15    off attempt.

16           I think though by putting that class cert, it

17    artificially requires too much work to be done early on in the

18    case when we still haven't determined yet who has got

19    standing.  Is it Chris?  Is it David?

20           Thirty days is probably too short.  I think that Alex

21    has tried to narrow down these requests from (unintelligible).

22    And I have seen in every case he has somehow -- there is new

23    discovery requests because he's honing it better and better

24    trying to get (unintelligible) maybe not necessarily for my

25    client, but these are for him to find a class.

1        But I think though that he knows by the nature of the

2   business that it is not that simple to say, wait, how do

3   records not show something?  Because it is sort of like, not to

4   sound too casual, but the when did you stop beating your wife

5   argument?

6        It is not that simple to hit a button and print out

7   these records and show here's numbers you didn't get.  We have

8   to sort of compare what we got from Cap One to what Cap One

9   gave to us and then do that for all of our creditors.  Then go

10  through what we got showing somebody else consenting.

11       But just because we may have called -- we may have

12  received numbers, and they may have been bad numbers that were

13  disconnected, we then performed -- we then got a call back on

14  the letter we sent and said, please call me back on my cell

15  phone.

16       So I think a more robust, larger time period would

17  allow us to work something out.  And it may, I think, in all

18  reasonableness allow Mr. Burke and I to work through something,

19  to the extent I'm still on the case for a while, he's working

20  with the other law firm that might be coming in, but I just

21  think 30 days is -- probably isn't going to be enough time to

22  get this done.

23       And, again, it is contention interrogatories.  The

24  case is -- you know, discovery closes in May.  Chris Mack might

25  be brought in from his bankruptcy, might not.  His client has

1    already rejected a very, very, very robust pick-up attempt.  So

2    I don't think there is going to be this issue of there has to

3    be a class cert motion out there to keep this case going.

4         I understand that he wants to get this discovery, but

5    it is just not that simple.  And I appreciate this Court

6    allowing me to try to explain it this way.  But Cap One I don't

7    think is going to be upset about this, but they want the legal

8    process to take place.

9         I will issue that subpoena.  I will be in contact with

10   their legal counsel.  I tried, you know, to (unintelligible)

11   them over to get these records, and I couldn't get them.  And I

12   think the next --

13        THE COURT:  Is Capital One the -- is that the only

14   client here?

15        MR. VLAHAKIS:  No.  There is -- that's the nature of

16   this kind of request that it could relate to -- the class isn't

17   just anybody that had an account with Cap One that MRS may have

18   called up without consent.  We have to go through with their

19   other creditors and do the same thing.

20        Mr. Burke, though, might find that there might be

21   enough people that would call Cap One that the class might

22   relate to Cap One.  I don't know.

23        THE COURT:  Well, before you -- you arguably you have

24   got (unintelligible).

25        MR. VLAHAKIS:  Granted, that then it doesn't buy my

1  client (unintelligible) in the case there is a settlement, but

2  we have to work through all that.

3          The issue also that we're finding out is that by going

4  through all the various creditors that we may have worked with,

5  there is various credit agreements with all of those companies

6  that may have had, for instance, in our case an arbitration

7  clause.

8          So to the extent Chris Mack comes back in this case,

9  he may be subject to arbitration clause.

10         David Mack is a better plaintiff for Mr. Burke because

11  David Mack never had an account with Cap One, and so he

12  wouldn't be bound by an arbitration clause.

13         THE COURT:  (Unintelligible).

14         MR. VLAHAKIS:  But I mean --

15         THE COURT:  Okay.  Mr. Burke, let me hear from you.

16  All right?

17         MR. BURKE:  We have got about two months left in

18  discovery of like a nine-month discovery period.

19         I filed this motion three weeks ago.  I figured we'd

20  have enough time for the defendant to have about 30 days to

21  give me the stuff and then for me to do follow-up discovery if

22  necessary.

23         I mean, this is -- it is an affirmative defense that

24  was raised in July and subject to Rule 11.  We have already

25  established, I think, and I'm sure that they would disagree,

1   that there is no consent for the plaintiff.  There are a lot

2   more people like the plaintiff, and I want to know who they

3   are.

4        I would request that your Honor compel the request

5   that I am asking for and set a cutoff date for all materials

6   having to do with the affirmative defense 30 days out.

7        THE COURT:  Okay.  Well, the motion to compel, I'm

8   granting -- I'm granting the motion to compel.  The question is

9   how much time are you going to need to -- reasonably to get

10  this done, including subpoenaing of Capital One.

11       MR. VLAHAKIS:  Uh-huh.

12       THE COURT:  And that might -- if we have to go into

13  enforcement of that subpoena, then that could affect the dates

14  that you have to produce.

15       But I expect you to, Mr. Vlahakis, to -- and I do

16  commend both of you guys, you know, (unintelligible), your

17  clients, that you guys are getting along.  That makes it

18  better.  Okay?

19       But I have --

20       MR. BURKE:  For us too.

21       THE COURT:  Right.  You are going to have to exert

22  some pressure, I guess, on -- you know, I have seen these

23  affirmative defenses in so many cases, but you have got to

24  prove it.  You have got to prove that you have that defense.

25       And so I'm going to conduct -- let's give them six

1  weeks, Alicia, rather than 30 days.  45 days.

2          THE CLERK:  April 8th.

3          THE COURT:  April 8th to get that information to

4  Mr. Burke.

5          And if you are having difficulties in doing that --

6  well, certainly I expect you to issue your subpoena immediately

7  to Capital One.  And if they don't comply or they give you some

8  push back, file your motion to compel or order to show cause

9  why they shouldn't be held in contempt for not complying with

10 that subpoena.  So we're going to do it in six weeks.

11         What was it again, April?

12         THE CLERK:  8th.

13         THE COURT:  April 8th.  By that time you will have

14 certainly given Mr. Burke something to -- as for lack of a

15 word -- something to chew on.

16         But, you know, if we have to go into the enforcement,

17 we'll do it.

18         MR. VLAHAKIS:  One point of clarification though.  I'm

19 always uncomfortable with a -- sort of an omnibus order saying

20 motion to compel granted.  And to the extent that the motion

21 is --

22         THE COURT:  I rejected your argument all throughout.

23 Okay?

24         MR. VLAHAKIS:  Uh-huh.

25         THE COURT:  Okay?  So I guess I looked at the

1   reasonableness of the motion to compel -- I mean, the discovery

2   requests.  I looked at them, and I found they were

3   unreasonable.

4        MR. VLAHAKIS:  Well, my point, and I'm just drawing to

5   one particular one, I understand he's asking the identity of

6   the sources for the numbers and the consent of the numbers.

7   But he's also asking for, which I believe we have objected to

8   and discussed at the last hearing, the list of all the numbers

9   and people called, time called, and whatnot.  And I think that

10  is something he doesn't need at this juncture.  It is premature

11  to have a class list.

12       His primary motivation of that what -- with that was

13  he was worried that we were going to pick up David and Chris

14  Mack.  It serves no utility now to have that.  It is a

15  tremendous amount of data.  Privacy concerns and whatnot.

16       I'm not even sure I could provide that to him subject

17  to the contract we have with Cap One and other creditors.

18       So that's why, at least on the motion to compel, yes,

19  we have worked with issuing the subpoena, worked with providing

20  our internal records to him, but not giving him this entire

21  list of all the types and times that people were called.  It is

22  just -- that's something that if we need to --

23       THE COURT:  Do you need that now, Mr. Burke?

24       MR. BURKE:  I do, Judge.

25       THE COURT:  If we are working on the consent issue?

1      MR. BURKE:  I do, Judge.

2      First of all, these people -- I don't think we'll need

3 them, but these people are all potential witnesses, fact

4 witnesses.

5      They are.

6      THE COURT:  Okay.

7      MR. VLAHAKIS:  It is preserved.

8      MR. BURKE:  They --

9      MR. VLAHAKIS:  It has been preserved

10      MR. BURKE:  They -- these records are going to show

11 the number of calls for each person.  Each call is a violation.

12      THE COURT:  Right.

13      MR. VLAHAKIS:  We're preserving it.

14      MR. BURKE:  Each -- the records are also going to

15 show -- for example, the recordings of phone calls, they are

16 going to show who was in our subclass, which is -- consists of

17 people for whom messages were left for someone other than the

18 person who was identified in the voicemail greeting.

19      MR. VLAHAKIS:  Well --

20      MR. BURKE:  At the time --

21      MR. VLAHAKIS:  Go ahead.  Sorry.

22      MR. BURKE:  These records are relevant, they are

23 discoverable, and we would like them now.

24      THE COURT:  They certainly -- they are discoverable.

25 But Mr. Vlahakis is arguing that you are not entitled to them

1    now.  You shouldn't have to get them now.

2         MR. VLAHAKIS:  We already spent, at the time of filing

3    my answers to discovery, 200 hours in compiling, saving, moving

4    data to servers, buying new servers, holding everything.

5    (Unintelligible) 100 hours doing -- just working on other stuff

6    on this case since then.  All that stuff is being preserved

7    under -- absolutely certain of that.

8         So to the extent we're preserving -- we're providing

9    it to him, that would be just a Herculean task at this point.

10        If he wants (unintelligible) some issues, we can do

11   that.  If we identify people who have consent -- we believe

12   consented, then I understand the relevancy of producing that

13   and litigating that issue, whether Joe Blow or John Doe

14   consented, fine, we can go to that person as a witness.

15        But right now to say, give us these, you know,

16   millions of records is just sort of ridiculous.

17        MR. BURKE:  This is exactly what -- this is what all

18   the requests are asking for, identify the people.  Show us the

19   documents.

20        They can't give us that information without providing

21   names and addresses and all the other information.

22        MR. VLAHAKIS:  But what he's asking for in just

23   the -- is every record, recording, outbound data call you

24   have.  He's asking -- he is -- to give it all at once.  I

25   understand his point, give us stuff that shows consent.  We'll

do that.  But just to give him every single thing of every

single call and every single recording of every single call

makes absolutely no sense.  We're talking probably terabytes of

data.

MR. BURKE:  As I explained earlier, our requests are

narrowed.  Interrogatories 5, 6, and 7 ask for -- that's a

series of specific requests asking, first, for the -- a list of

people that didn't give the original creditor or MRS their

phone number.

The second, identify where those phone numbers came

from if they didn't come from the recipient.

And, third, if you think that the subset of people

that you -- that in the previous interrogatory provided prior

expressed consent, tell us why.

We're not asking for -- we don't want to know about

people who gave their cell phone number to Capital One or MRS.

We're putting them to their test.  This is their

affirmative defense.  We want to know the evidence that

supports it, if there is any.

I don't think they can get it.  I don't think they

have it.  I don't think they ever had it.  And I think that

this whole thing is a red herring.

But I guess they are going to keep trying.  But we

can't do any of this without receiving information about these

people.

1       THE COURT:  Yeah, I have got to agree with that,

2  counsel.  I know that in prior cases these same issues have

3  been coming up.  I mean, I certainly don't blame you for

4  imposing your affirmative defense and hoping that you can -- or

5  believing that you can come up with the evidence to show that

6  there was consent.

7       But, on the other hand, we do have this -- you know,

8  there is a Rule 11 issue here also that we have to be cognizant

9  of.  It is one of those things that you either put up or you

10  shut up.  If you can't prove it, you know, that is problematic

11  for you.

12       MR. VLAHAKIS:  Uh-huh.

13       THE COURT:  Okay?  And I would guess that somewhere

14  along the line eventually you are going to find that some of

15  these people consented.  But that's on you.  That's your

16  burden.

17       So I'm granting the motion to compel in its entirety.

18  And if you have some problems in completely complying with

19  that, you can come back to the Court and explain that.

20       MR. VLAHAKIS:  Your Honor --

21       THE COURT:  But I expect you to comply by -- April

22  8th, Alicia?

23       THE CLERK:  8th.

24       THE COURT:  -- April 8th.

25       Let's have another status about two weeks after that.

1      THE CLERK:  April 22nd at 9:00 A.M.

2      THE COURT:  And April 22nd.

3      See you then.

4      MR. BURKE:  Thank you.

5      MR. VLAHAKIS:  Thank you very much.

6      (Which concluded the proceedings in the above-entitled

7  matter.)

8                        CERTIFICATE

9      I HEREBY CERTIFY that the foregoing is a true, correct

10  and complete transcript of the proceedings had at the hearing

11  of the aforementioned cause on the day and date hereof.

12

13  /s/ Pamela S. Warren                    March 8, 2011
    Official Court Reporter                    Date
14  United States District Court
    Northern District of Illinois
15  Eastern Division

16

17

18

19

20

21

22

23

24

25

# Appendix 2

1

2               IN THE UNITED STATES DISTRICT COURT
                  NORTHERN DISTRICT OF ILLINOIS
3                        EASTERN DIVISION

4   TODD FIKE, on behalf of        )
    himself and others similarly   ) Docket No. 09 C 2558
5   situated,                      )
                                   ) Chicago, Illinois
6                 Plaintiffs,      ) November 13, 2009
                                   ) 9:30 a.m.
7          v                       )
                                   )
8   THE BUREAUS, INC.,             )
                                   )
9                 Defendant        )

10

                  TRANSCRIPT OF PROCEEDINGS
11          BEFORE THE HONORABLE ARLANDER KEYS

12
    PRESENT:
13
    For the Plaintiff:       ALEXANDER H. BURKE
14                           Burke Law Offices, LLC
                             155 North Michigan Avenue
15                           Suite 9020
                             Chicago, Illinois  60601
16

17  For the Defendant:       PETER E. PEDERSON, JR.
                             Hinshaw & Culbertson LLP
18                           222 North LaSalle Street
                             Suite 300
19                           Chicago, Illinois  60601-1081

20  (TRANSCRIBED FROM ELECTRONIC RECORDING.
     PLEASE SUPPLY CORRECT SPEAKER  IDENTIFICATION)
21

22  Court Reporter:          Lois A. LaCorte
                             219 South Dearborn  Room 1918
23                           Chicago, Illinois 60604
                             (312) 435-5558
24

25

[1]

1         THE CLERK:  09 C 2558, Fike v The Bureaus.

2         THE COURT:  Good morning, counsel.

3         MR. BURKE:  Good morning, Judge, Alexander Burke for

4  the plaintiff.

5         THE COURT:  Good morning, Mr. Burke.

6         MR. PEDERSON:  Good morning your Honor, Pete Pederson

7  for defendant.

8         THE COURT:  Good morning, Mr. Pederson.  We have The

9  Bureaus' motion to compel and also plaintiff has a motion to

10  compel, right, Mr. Burke?

11        MR. BURKE:  That's right, Judge.

12        THE COURT:  Let's talk about plaintiff's -- first of

13  all, the defendant's motion to compel, isn't that moot now.

14        MR. BURKE:  I think so, Judge.  We provided the

15  signature under oath that they asked for.  Mr. Fike went to his

16  cell phone carrier and obtained all the records that he could

17  going through 2007 and those have been produced The Bureaus.  If

18  The Bureaus wants more records, they can subpoena them and we

19  certainly won't oppose that, but my understanding and my client's

20  understanding is that we have provided everything that he is able

21  to obtain.

22        And then as to the interrogatory response that they

23  want, I think Mr. Fike has given everything, all the information

24  he knows in response to the interrogatory.

25        MR. PEDERSON:  Well, your Honor, there were three

1  aspects of the motion to compel.  We sought Mr. Fike's signature

2  under oath.  That was provided, it's moot.  We also sought the

3  phone bills.  So far we have the phone bills for May 2007 to May

4  2008 and then September 2008 through January 2009, which was the

5  period -- the last period when the phone calls by TBI were made.

6  There is a gap from May 2008 to September 2008.  We haven't

7  received those phone bills.

8          THE COURT:  It's those three, May, June -- four months

9  there.

10          MR. PEDERSON:  Right.  So that aspect of the motion to

11  compel isn't moot.  And then we have also requested contacts

12  between Mr. Fike and the original creditor.  We have a very bare

13  bones response in the original interrogatory answer, which says

14  "I remember scheduling the dentist appointment and making certain

15  payments."  We would like the actual cancelled checks and any

16  written communication between the creditor and Mr. Fike because

17  the checks and the written communications would go to whether Mr.

18  Fike provided the phone number, his cell phone number to the

19  creditor, which would constitute consent under the TCPA.

20          THE COURT:  Do you agree with that, Mr. Burke?

21          MR. BURKE:  Well, I take issue with the comments about

22  what constitutes consent.  I don't know about the cancelled

23  checks.

24          THE COURT:  Do you agree if he contacted, if your

25  client contacted the creditor by cell phone, that that is consent

[3]

1 for him to be contacted by the creditor by phone?

2        MR. BURKE:  I certainly do not agree with that, Judge.

3 In fact, in our response to the motion to compel, we cited a

4 footnote in the FCC order which is controlling on the merits of

5 this case that says that that, expressly says that that is not

6 consent under the TCPA.

7        THE COURT:  Okay.  Still we're talking about discovery

8 here, not about the ultimate, whether it's going to get it into

9 evidence.

10        MR. BURKE:  I agree, Judge.  I didn't know about this

11 gap in the records.  I know that Mr. Fike went and tried to find

12 his phone records and he got everything he could get.  I'll go

13 back to him and see if he can get this gap.  We will try to get

14 that gap.  As far as cancelled checks, I haven't spoken with him

15 about the cancelled checks.  We can see if he can find the

16 cancelled checks.  Otherwise, we will subpoena the cancelled

17 checks.

18        THE COURT:  Okay.  Now, with regard to the motion to

19 compel filed by the plaintiff, you raise the consent defense, but

20 you claim that you don't have to produce evidence on the defense

21 unless the class is certified.  You're absolutely wrong on that

22 one.  You're not going anywhere with that one.  You claim that in

23 your opinion it's never going to be certified, the class is never

24 going to be certified and that you're producing the evidence

25 that's being sought here prior to any, in view of the fact that

1  it's not going to be certified, it's too burdensome, and you

2  shouldn't have to do it.  That is not the law in this area.

3         You have to -- it's going to be up to Judge Dow at some

4  point to decide whether the class is going to be certified and

5  one of the issues is going to be whether there was consent,

6  right, of the class -- of the putative class?

7         MR. PEDERSON:  I don't disagree with most of what your

8  Honor said.  I think the thrust of the motion was that discovery

9  on the merits of a class claim is improper if the plaintiff fails

10 to make a threshold showing that the class is suitable for class

11 certification, and plaintiff has not cited a single case which

12 has certified for class treatment the theory under the TCPA that

13 Mr. Fike brings.

14        When a debt collector is making auto dialed and

15 prerecorded message calls to consumers, those calls will comply

16 with the TCPA unless the consumer never provided his cell phone

17 number to the creditor.  But the court cannot without conducting

18 mini trials into the dealings between each potential class member

19 and the creditor figure out whether the class member actually

20 provided his number to the creditor and thereby consented, and

21 this individual question precludes certification under Rule

22 23(b)(3) and it also precludes identification of the class.

23        So the argument was that he has not shown a case that's

24 prima facie capable of being certified under Rule 23, therefore,

25 merits based discovery on the class claim is inappropriate.

1          THE COURT:   But you're claiming that this, what he is

2   seeking is going to the merits of the claim.

3          MR. PEDERSON:   It goes to whether they consented and so

4   it's not, it doesn't go to the question of numerosity or the

5   typicality, it goes to the question of whether these individuals

6   are subject to a defense that can only be proven through a mini

7   trial, which would preclude class certification.   And in many

8   cases the evidence concerning consent is in the hands of third

9   parties and therefore, we are not required under the discovery

10  rules to produce that information as it's not in our possession

11  or control.

12         THE COURT:   Well, who has it?

13         MR. PEDERSON:   It would be in the hands of --

14         THE COURT:   The client, right?

15         MR. PEDERSON:   It would be in the hands of the creditors

16  and the class members.

17         THE COURT:   Well, do you know who the class members

18  are?

19         MR. PEDERSON:   No, your Honor, we don't because we can't

20  generate a list of individuals who received calls on their cell

21  phones without having consented to the calls.

22         THE COURT:   Well, how does the plaintiff find out who

23  the class members are if you don't produce discovery to them

24  regarding --

25         MR. PEDERSON:   We can produce a list of numbers with the

 1  relevant area codes that we contacted during the time frame, but

 2  we can't provide a list of numbers that we contacted where the

 3  individual did not consent to be contacted because we don't have

 4  information about the dealings between each class member and the

 5  creditor.

 6       So we could produce an overinclusive list of individuals

 7  who were contacted, period, but many of those individuals will

 8  not be class members because they consented to receive calls or

 9  because the call was actually placed to a land line rather than a

10  cell phone.

11       THE COURT:  Can't you find out which ones of them

12  consented and did not consent?  I know it's burdensome, but can't

13  you do it?

14       MR. PEDERSON:  Not without an extremely burdensome and

15  time-consuming investigation into the dealings between every

16  class member and the creditor, and under the discovery rules, we

17  aren't required to go out and obtain information in the hands of

18  third parties, we're only required to turn over information in

19  our control.  If we turn over the information in our control, the

20  list will be overinclusive.

21       THE COURT:  Well, somebody has got to -- I know you

22  feel like you're between a rock and a hard place here, but on the

23  one hand, the plaintiff is entitled to know which of the

24  individuals on your list consented.  They shouldn't have to --

25  say there are a thousand people on your list.  They shouldn't

1 have to interview all thousand of those people to determine

2 whether they are properly part of this class because they

3 consented when you could get that information easier from your

4 records.

5        MR. PEDERSON:  Your Honor, our records won't disclose in

6 all cases whether the consumer consented to be contacted because

7 that information will be in the hands of the creditor, and the

8 Chaveriat opinion that we cited in our brief states that the

9 litigant is not required to produce information that is in the

10 possession or control of a third party.  The litigant has a duty

11 to produce information in its own possession or control.

12        In that case the plaintiffs had hired an engineering

13 contractor or some scientific contractor to do I believe soil

14 chemistry assessments.  They were requested in discovery to

15 produce certain information in that contractor's possession.

16 They failed to produce it and the district court entered a

17 sanction against them for failing to produce it.  The Seventh

18 Circuit reversed on the ground that the information in the

19 contractor's possession was not in the possession of the

20 plaintiffs and therefore, they could not be -- they could not be

21 sanctioned for failing to produce information in the third

22 party's possession.

23        And this is a similar case where is evidence related to

24 consent is in the possession of a third party and therefore, we

25 are not -- we have no duty and we have no ability to produce that

1  information.

2          THE COURT:   So under the ruling on the Chaveriat,

3  wasn't it?

4          MR. PEDERSON:  Chaveriat.

5          THE COURT:   You as a debt collector have no duty to

6  insure that the creditor that you represent here --

7          MR. PEDERSON:  That's correct.

8          THE COURT:   What does the plaintiff do here, make the

9  creditor also a defendant in this case?

10          MR. PEDERSON:  Well, your Honor, it goes to the

11  impracticality of handling this case on a class basis because the

12  information concerning whether potential class members have valid

13  claims is distributed across many parties.  It could be in the

14  hands of the creditor, it could be in the hands of the consumer.

15  In some cases the consumer might expressly consent to TBI and

16  there will be a notation in the database, but none of these

17  evidence -- none of the categories of evidence of consent can be

18  resolved in a straightforward manner for the entire class.  It

19  would have to be -- the question of consent would have to be

20  resolved for each class member individually.

21          THE COURT:   Okay, then you're arguing against

22  certification.

23          MR. PEDERSON:  Correct.

24          THE COURT:   But what does -- what would Mr. Burke say

25  to try to refute that --

[9]

1          MR. PEDERSON:  Well, your Honor --

2          THE COURT:   When you make that argument if he doesn't

3     have some evidence from you?

4          MR. PEDERSON:  Your Honor, what we could do is produce a

5     sample of our database on a random sample of class members and

6     that would include the information in our database about those

7     individual class members.  But it would be improper I think for

8     the court to order us to produce the complete universe of

9     information in our possession and all 7,000 potential class

10    members when such production would be overinclusive because maybe

11    some of the individuals are not members of a class either because

12    they did not receive calls on their cell phones or because they

13    consented.

14         THE COURT:   Well, what does the plaintiff -- not just

15    Mr. Burke, but what does a plaintiff do in that situation, just

16    simply back away and say "Since they won't give it to us, we will

17    just voluntarily dismiss this" or how does he prove it?

18         MR. PEDERSON:  Your Honor --

19         THE COURT:   He can't prove it.

20         MR. PEDERSON:  Well, plaintiff can make the argument

21    that the court should disregard the question of consent and

22    presume --

23         THE COURT:   I don't think that's going to fly.

24         MR. BURKE:   I think the defendant is making that

25    argument, that you should disregard the question of consent.

1        MR. PEDERSON:  And the other argument the plaintiff can

2    make is that the, a production of a random sample of potential

3    class members would show that the question of consent does not

4    prevent the class from being certified.

5        THE COURT:   And you would oppose that argument, of

6    course.

7        MR. PEDERSON:  We would oppose that argument.  But we

8    think, your Honor, if you order us to produce the complete

9    universe of information on all potential class members or on a

10   random sample of class members, we will argue vigorously to Judge

11   Dow that consistent with the other cases that have examined this

12   type of theory, the question of consent precludes class

13   certification.

14       THE COURT:   Yes, it precludes class certification, but

15   it doesn't preclude discovery.  It doesn't preclude discovery.

16   This case has not been bifurcated, first of all, so you talk

17   about merits versus class certification issues.  That's not --

18   you're not going to get anywhere with that.

19       The issue is that the plaintiff is going to have to show

20   how many or approximately how many of the individuals whom you

21   have attempted to collect from actually consented to your taking

22   your cell phone call.  He has got to prove that.  How does he

23   prove that if you don't give him the information, the evidence on

24   it that you have because he has nothing?

25       MR. PEDERSON:  My response to that, your Honor, is that

1  the plaintiff cannot prove on a class wide basis for all class

2  members whether consent was given without mini trials on the

3  question of consent.  And that precludes class certification.

4       It doesn't matter, your Honor, what information we give

5  Mr. Fike in response to this court's order on the pending motion.

6  Mr. Fike will be unable as a matter of law to resolve this

7  question on a class wide basis such that a class can be certified

8  under Rule 23.

9       THE COURT:  Mr. Burke, you agree, right?

10      MR. BURKE:  Well, if they withdraw their consent

11  defense, if it doesn't matter what information they give me,

12  that's fine.  You know, if they say "We have nothing and we're

13  not providing anything," I think the class will be certified

14  because they have no consent defense.

15      We're -- I don't think they have any evidence and I

16  don't think they can get any.  I mean, Mr. Fike did not consent.

17  They got his, they got his cell phone number from a third-party

18  skip trace company and we have asked subsequently in discovery

19  for all the people they got phone numbers from the skip trace

20  company and there is some law on that too.

21      But the bottom line as to the consent issue is that they

22  brought an affirmative defense of prior express consent.  They

23  have the burden of proof on this defense and we have asked, we

24  have asked for the evidence.

25      THE COURT:  And I think that's really the bottom line

[12]

1  here, counsel.  You have raised an affirmative defense of consent

2  as to some of these people.  You're not saying that everybody

3  consented, are you?

4      MR. PEDERSON:  We don't know, your Honor.

5      THE COURT:   You don't know if they did or not?

6      MR. BURKE:  That raises Rule 11 implications, Judge.

7      THE COURT:   How can you consistent with Rule 11 make

8  that defense if you don't know?

9      MR. PEDERSON:  Well, your Honor, it's a fact of modern

10  life that people use their cell phones.

11      THE COURT:   And you're probably right.

12      MR. PEDERSON:  As the default means of communication.

13  For example, in my own case, your Honor, I haven't had a land

14  line since I think 2000.  So every creditor I deal with I provide

15  my cell phone number to, and under the FCC ruling I'm deemed to

16  consent to receive auto dialed and prerecorded message calls on

17  my cell phone.  So it's reasonable to assume that a very

18  substantial percentage of the debtors who were contacted by TBI

19  did in fact consent by providing their number either to TBI or

20  the creditor.

21      And if your Honor orders us to produce information on

22  the class members or the potential class members, of course, we

23  will comply with your Honor's order.  Our argument is at the end

24  when the smoke settles, Mr. Fike will be unable to provide Judge

25  Dow with the means of resolving the question of consent on a

[13]

1  class wide basis such that the class will be certified.

2       THE COURT:   And that happens a lot, that we order stuff

3  to be produced and in the final analysis they can't use it so

4  they lose.

5       MR. PEDERSON:   I would just ask, your Honor, that

6  instead of ordering TBI to produce the complete universe of

7  information on all potential class members, many of whom will not

8  be members of the class because they consented or they were

9  contacted on a land line rather than a cell phone, that your

10 Honor order TBI to produce information on a random sample of the

11 potential, the 7,200 potential class members that TBI has

12 identified based on a database search.

13      THE COURT:   But in this kind of case I don't think

14 sampling -- I have done sampling in cases, but this is probably

15 not one that I would want to, want to have engaged in sampling.

16 So I know it is somewhat burdensome for you, but I think it can

17 be done, and more importantly, without you producing something to

18 them, you know, with regard to your affirmative defense of

19 consent, you know, they're going to have a tough time trying to

20 prosecute this case.

21      I don't care who wins the case, it doesn't matter to me,

22 but at least you have got to give the plaintiff an opportunity to

23 go to the next level, that is, to argue for certification of the

24 class.  And if they don't -- if they can't -- if they can't give

25 some indication to the district court as to the number of those

1  people who did not give consent, well, then that's their case.

2  And you claim that they're never going to be able to do it

3  because these are individualized assessments that have to be

4  made, and you may or may not prevail on that.

5           But we are talking about discovery here and even though

6  it might be costly, time-consuming, I don't know how

7  time-consuming it is because I have listened to you two lawyers

8  making your arguments, but nobody has come forward from your

9  company to tell me exactly what they have to do to get all this

10  information.  I can't just accept your representations in that

11  regard.  I saw the affidavit that was filed by, what's her name?

12           MR. PEDERSON:  Marian Sangalang.

13           THE COURT:  But I think it can be done, it can be done.

14  It may be rather burdensome and I, you know, I recognize that in

15  these kinds of cases that the kind of discovery that's being

16  sought could influence a defendant to try to settle the case

17  rather than litigate it.  I know that's an argument that comes

18  down, but I think this is a legitimate area that the plaintiff

19  should be able to get information from, and to the extent that

20  you have it, you will have to give it up.  And that is with

21  regard to the -- Mr. Burke, what was it particularly that you

22  were asking for?

23           MR. BURKE:  It's on page 6 of our motion.  We're asking

24  for responses to those particular interrogatories and document

25  requests:  Interrogatory 4, 9, 10 -- there should be some overlap

1  with these -- document requests 3, 4, 5, 6, 28 and misnumbered

2  28 -- pardon me, misnumbered 12 that I renumbered 28A.

3          THE COURT:   Okay.  I have reviewed those and I don't

4  see how you can get around not having to respond to those and

5  that's going to be my order.

6          MR. PEDERSON:  Well, your Honor, we will comply with the

7  court's order.  It would be helpful for us to know exactly what

8  information we are required to produce so that we can comply with

9  the order.  Are you ordering production of the evidence of

10  consent in TBI's possession relating to all potential class

11  members?

12          THE COURT:   Right.  The class members there are limited

13  to Illinois, right?

14          MR. BURKE:  That's correct, Judge.  I think that we

15  during the talks, the Rule 37 talks we narrowed that a little bit

16  more.

17          MR. PEDERSON:  The class definition was modified, your

18  Honor.  It now covers only individuals who had 312 and 773 area

19  code numbers.

20          MR. BURKE:  That's correct, Judge, but I take issue with

21  the 7,000 number that Ms. Sangalang put in her affidavit.

22          THE COURT:   Is there more?

23          MR. BURKE:  There absolutely is more, your Honor.

24  That's apparently the number of persons that were, that TBI left

25  prerecorded messages for, but they haven't provided the number

1  for the number of people that they called that they're auto
2  dialing.
3      MR. PEDERSON:  Your Honor, the estimate of 7,200 was for
4  the number of prerecorded message calls to accounts with 773 and
5  312 area code numbers.  They did not include --
6      THE COURT:   The auto dial, you did not include that?
7      MR. PEDERSON:  We did not include auto dialed calls
8  where there would have been a collection agent available to take
9  the call if a live human being answered.
10      THE COURT:   She is not saying that you can't retrieve
11  that information.
12      MR. PEDERSON:  No, we didn't say that, your Honor.
13      MR. BURKE:  They just ignored it.
14      THE COURT:   And auto dial of course, that's a real
15  problem for you.
16      MR. PEDERSON:  Your Honor, I don't want to retread
17  ground or replow ground we have already plowed.  The difficulty
18  with a production for all individuals who received calls is that
19  many individuals had land lines that were called and our
20  information does not in all cases show whether the call was
21  placed to a land line or a cell phone.
22      So if your Honor orders us to produce evidence of
23  consent on all individuals who received either auto dialed or
24  prerecorded message calls during this time period, many of these
25  individuals will not be members of the class because of the

1   question of consent, which we have already gone over, but also

2   because we don't know whether the phone is a land line or a cell

3   phone, which I think would also counsel in favor of doing a

4   sample of, a production on a sample of class members rather than

5   the complete universe.

6           THE COURT:  Well, a sample we're not going to do.  Mr.

7   Burke.

8           MR. BURKE:  I agree, a sample won't give me what I'm

9   entitled to, I think, under the discovery rules.  You know, I

10  think this goes back to the possibility of Rule 11.  I mean, if

11  they have no idea which numbers they called that were cell phone

12  numbers, I look forward to telling the jury that.  But how can

13  they raise a defense in the case if they don't even know the

14  first step, they don't know who falls into the first step of

15  their defense?  I think there is a problem here.

16          THE COURT:  I don't want to tread on their Rule 11, but

17  I understand what you're saying.  I have read it.

18          MR. PEDERSON:  We have already addressed that, your

19  Honor.  We know for a certainty that many of these individuals

20  did give their cell phone numbers so there will have been

21  consent.

22          THE COURT:  I don't think that argument is going to win

23  for you that well, you know, considering modern day technology,

24  more than likely some of them did give their consent.  That's not

25  to get you anywhere.  But that's a Rule 11 issue.  I don't want

1  to deal with that at this point.

2          You're going to have to do better.  You're going to have

3  to -- you have an affirmative defense.  Either you can withdraw

4  your defense, I know you're not going to do that, I don't blame

5  you, or you've got to produce evidence to support it.

6          MR. BURKE:  And, Judge, I just wanted to mention that

7  unlike the Chaveriat case that was cited by the defendant, we

8  issued interrogatories asking for not only information that is in

9  their possession, but information that they know about that

10  supports their defense.  So I just wanted to mention during this

11  hearing that The Bureaus isn't limited to just information that's

12  in their possession, but anything that they know about must be

13  disclosed.

14          THE COURT:  Well, if that's the way it's worded.

15          MR. BURKE:  Absolutely.

16          THE COURT:  But you understand now what they're looking

17  for?

18          MR. PEDERSON:  I understand that your Honor is ordering

19  us to produce --

20          THE COURT:  Right.

21          MR. PEDERSON:  -- evidence in our possession related to

22  the question of whether potential class members --

23          THE COURT:  Evidence that you have.

24          MR. BURKE:  That they know about, that supports their

25  defense.

 1          THE COURT:  I don't agree that in the context of this
 2   particular case that you're not required to produce evidence that
 3   might be in possession of third parties, third parties here being
 4   your client, that is, the creditors.  I don't read Chaveriat or
 5   whatever that case is, I didn't read that as in the context of
 6   this case as allowing you to simply sit on your hands or go to
 7   the client and get things.  I didn't read it that way at all.
 8          So I'm going to order you to comply, respond to all of
 9   the outstanding discovery and that is both the interrogatories
10   and documents.  Are there interrogatories in it also?
11          MR. BURKE:  Yes.
12          THE COURT:  All right.  And with regard to the costs
13   here, I think because there could have been some confusion,
14   counsel, as to what your responsibilities are in this particular
15   case, I'm going to deny the fees and costs without prejudice.
16   Let your client know that if we have to revisit the issue again
17   I'll allow Mr. Burke to renew the motion.
18          Okay, the fees and costs sanctions are denied without
19   prejudice, give you some incentive to try to get your clients
20   to -- I know your clients -- you're an officer of the court --
21   your clients don't take to turn over stuff, but you know that
22   they have to and you have to, as their lawyer you have to
23   convince them that it's the right thing to do or they could have
24   sanctions as well.
25          MR. PEDERSON:  Your Honor, we will fully comply with

1  your Honor's order and our obligations under the Federal Rules of

2  Civil Procedure.

3          I do need some clarification about the production you're

4  ordering.  My understanding was that you were ordering the

5  production of the information in our possession.

6          THE COURT:  You keep saying "possession."  That's not

7  the word.  I mean, you have -- if this information is in the

8  possession of your client, then you have to give it to them.

9          MR. PEDERSON:  We will produce that information, your

10 Honor.  My point is that we do not have the power or the duty to

11 produce the information in the creditors' possession related to

12 the question of consent.  In Chevariat it speaks expressly to

13 this question.

14         THE COURT:  Your client, the creditor is your client in

15 this case.

16         MR. PEDERSON:  And Chevariat deals with this fact

17 pattern.  It says that the existence of a contractual

18 relationship between a litigant and a third party does not

19 obligate the litigant to produce information in litigation that

20 is in the possession of the third party.

21         THE COURT:  Your client is not a typical third party,

22 though.

23         MR. PEDERSON:  In the Chevariat case, though --

24         THE COURT:  You work for that client.

25         MR. PEDERSON:  My client typically has some type of

1  ongoing relationship where they will collect receivables for the

2  creditors, but there is no attorney-client relationship.  It's

3  not like they are fiduciaries necessarily.  The Chevariat case

4  dealt with an expert for the plaintiffs and the plaintiffs failed

5  to produce information in the expert's possession.  Judge Posner

6  writing for the Seventh Circuit said that the plaintiff had no

7  duty to produce information in the expert's possession simply

8  because the expert might have given the plaintiff that

9  information if the plaintiff had requested.  It's because the

10 possibility that a party might be able to obtain information from

11 a third party does not mean that the plaintiff or the litigant

12 actually has the control over that information, it means the

13 opposite because it's just that there is a mere possibility that

14 the party to the litigation can obtain the information from the

15 third party.  This is the holding of the Chevariat case.

16      So under this case law, we -- our client has no ability

17 and no duty to produce evidence in the hands of third parties,

18 the creditors in this case.

19      THE COURT:  So in theory you as the debt collector can

20 bury your head in the sand and say "We don't have to give

21 anything." Go after these guys.  They are the guys who did the

22 phone calls to the plaintiff.

23      MR. PEDERSON:  The plaintiff is able to serve subpoenas

24 for information he wants.  We will produce -- our obligation, our

25 obligation is to produce the information in our possession,

1  custody, or control, and we will produce that, but we have no

2  duty under the rules and under Chevariat to produce the evidence

3  and information that's in the lands of the creditors.

4        THE COURT:   Do you believe that if you went back to

5  your creditors and asked them for information that they would

6  refuse to give it to you?

7        MR. PEDERSON:  We have no idea.

8        THE COURT:   If you do that, if you do that and they

9  refuse to give it to you, that's another issue.

10        MR. PEDERSON:  We have no idea whether they will give us

11  the information.  And the --

12        THE COURT:   I think they would.

13        MR. PEDERSON:  Well, it's unknown.  It's a possibility.

14  Judge Posner said that the possibility that the third party will

15  hand over the information to the party does not mean that the

16  party has control over that information, it means the opposite

17  because it's uncertain.

18        MR. BURKE:  I suspect that what counsel is worried about

19  brings us to another portion of the motion to compel.  We asked

20  for the contract between The Bureaus and their creditors, and I

21  suspect, as I have seen in other cases, the contracts contain a

22  no warranty about information clause.  The creditors don't

23  want -- they won't to be bothered by The Bureaus.  This is a

24  major problem for The Bureaus in proving their defense.  I don't

25  think they can prove it.

1      But the bottom line is that this is their defense.

2      THE COURT:  Well, certainly the creditor is not going

3  to be very happy with you when you go back to them and say "Look,

4  we have got this court order that I have got to get this

5  information from you."  They're not going to be happy with you.

6  But so be it.  I mean, these are legal proceedings and I don't

7  think that the holding in that Seventh Circuit Chevariat case is

8  applicable in the case and I'm going to order that you comply

9  now.

10      On the other hand, if you try to get this information

11 from your clients and they tell you they're not going to give it

12 to you, that brings another issue, but at least you've got to

13 make an attempt to do that.  It might not make your client happy,

14 but you have got to make an attempt -- your clients have to make

15 an attempt, which they don't want to do, which is understandable.

16      MR. PEDERSON:  I just respectfully disagree with your

17 Honor that under the Chevariat case we have to --

18      THE COURT:  Okay, you disagree, but that's the order,

19 okay?  All right.

20      MR. BURKE:  Judge, there are two other sections.

21      THE COURT:  Let's give them 30 days.  30 days to comply

22 with the order.  The sanctions motion is denied without

23 prejudice.

24      MR. PEDERSON:  Your Honor, I don't believe there was a

25 sanctions motion, was there?

[24]

1      THE COURT:   Didn't you ask for fees in this?

2      MR. BURKE:   I think we asked for whatever the court

3 feels is appropriate and fee shifting is the --

4      THE COURT:   So you didn't ask specifically for fees.

5      MR. PEDERSON:  There is no prayer for fees.

6      THE COURT:   Well, then we will forget about it.  Strike

7 that.  If he didn't ask for it -- usually you guys ask for fees

8 and costs and all that.

9      MR. BURKE:   I just want the information, your Honor.

10      THE COURT:   Okay.

11      MR. BURKE:   Part 2, information and materials concerning

12 the Automatic Dialer and the messages.

13      THE COURT:   Well, I just said I granted your motion.

14      MR. BURKE:   Very good.

15      MR. PEDERSON:  Your Honor, part 2 of the motion sought a

16 number of categories of information and our position is that we

17 have fully responded to most of these requests.  As to the

18 automatic telephone dialer, we produced approximately 500 pages

19 of technical manuals about the capacities of the dialer.  We have

20 produced the contract for acquisition of the dialer and for

21 technical support relative to the dialer.  I'm not sure what

22 further information plaintiff would be entitled to under the

23 Federal Rules related to the dialing system.  I'm sure there are

24 customer support e-mails or letters related to the dialer, but

25 plaintiff has not met his burden of showing that the customer --

1   that the customer support e-mails would have any bearing on the

2   issues in this case.  I mean, TBI is a company that places a

3   large number of telephone calls, so there are going to be a large

4   number of communications that have some potential connection to

5   the dialer, but they won't have any bearing on the actual issues

6   in this case.  And the only issues in this case relative to the

7   dialer are whether it is an automatic telephone dialing system

8   under the statute.

9          THE COURT:   They want to know how it works.

10          MR. PEDERSON:  We have given them the manuals.

11          THE COURT:   What else do you want to know, Mr. Burke?

12  You have got them now so let's not have any confusion.

13          MR. BURKE:  Your Honor, we asked for contracts.

14          MR. PEDERSON:  We provided the contracts.

15          MR. BURKE:  Page 12 is the list of --

16          THE COURT:   Explain it to him because I have got

17  another matter here.  Explain to him what you're seeking here so

18  there is no confusion.

19          MR. BURKE:  Document requests 7, 8, 9, 10, 11, 12 and

20  14.  Your Honor, they have taken the position that they only have

21  to give us the 500 pages that they want to give us.  I don't know

22  whether counsel has even searched e-mails, for e-mails having to

23  do with the TCPA. Furthermore, we have a burden to prove that the

24  violation was willful and so we are entitled to look and see what

25  sort of interactions they have with anybody about the TCPA to

1  show that their actions were willful.

2      MR. PEDERSON:  Your Honor, we produced all the

3  information related to TCPA compliance and related to whether the

4  dialing system can store or produce numbers with a random or

5  sequential number generator.

6      MR. BURKE:  That is, that is --

7      THE COURT:  With regard to this portion of the order,

8  to the extent that you have not already done so, you will comply

9  completely with it.

10     Now, Mr. Burke says you haven't, and that's going to be

11 an issue you will have to point out to me how they haven't and he

12 will have to respond to that.  I would rather get rid of it now

13 so you don't come back again with the same argument.

14     MR. BURKE:  Absolutely.  What they have done is they

15 have provided, they have placed an artificial limitation upon the

16 discovery that they want to provide to us.  So they took language

17 from the statute, which strangely enough is not controlling as to

18 certain issues in this case.  And they say "Well, we're only

19 going to give you stuff that is relevant pursuant to the standard

20 that's in the statute."

21     The material that we are asking for is material that's

22 relevant under the FCC order from January 4, 2008, which like I

23 said, amazingly enough trumps the statute as far as issues of

24 liability, and what we are looking for is evidence or materials

25 that have to do with whether the autodialer calls people or is

1  able to dial without human intervention.  And once again, Judge,

2  we have to prove that this was willful.

3       MR. PEDERSON:  Your Honor, we have admitted that the

4  autodialer can dial numbers without a human being dialing them

5  and we have also, like I said, produced the 500 pages of

6  technical manuals showing what capacities the dialer has.  I

7  don't know what more information we could produce to show whether

8  the dialer is subject to the statute.

9       MR. BURKE:  Judge, he is telling you that they have

10 produced a bunch of stuff, but he is not saying that they

11 produced everything responsive.

12      THE COURT:  Well, let's get a declaration from someone

13 who knows, a high official there as to what they have and what

14 they will produce and that's all of it.

15      MR. BURKE:  I suspect that that declaration is going to

16 have some limitation in it similar to what we see in the response

17 to the motion to compel, and if so, I suppose I'll bring it back

18 to your Honor's attention and I'll ask for fees at that time.

19      THE COURT:  All right.  If this case comes back again

20 on these issues, and you ask for fees, you probably will get

21 them.  These TCPA cases, information you guys seek is basically

22 the same information on all of them and I have seen these many,

23 many, many times and this is no different than the others.

24      MR. PEDERSON:  Your Honor, I respectfully disagree --

25      THE COURT:  Have you had other cases before me that I

1  went the other way or what?

2       MR. PEDERSON:  I disagree that this is like other TCPA

3  cases because the plaintiff cannot point to a single case which

4  has certified this theory for class treatment under the TCPA.

5       THE COURT:  I'm talking about other cases that come

6  before me.  I have seen probably at least 50 of them.

7       MR. BURKE:  Judge, there are five, five other small

8  issues.  One is we have asked for information, documents and --

9       THE COURT:  I just granted your motion completely.

10      MR. BURKE:  This has to do with the FDCPA claim, your

11  Honor.  We have a claim for violation of the FDCPA.  We asked for

12  the information again relating to their bona fide error defense.

13  Their response to our motion to compel was that they have a

14  pending motion to dismiss and they don't have to provide that

15  information.

16      THE COURT:  Well, obviously, that can't fly.  Just

17  because you have got a motion to dismiss, you still provide the

18  information.  What's next?

19      MR. BURKE:  They provided Caller ID data, the

20  information about -- well, they provided some information about

21  what Caller ID that will show up on the recipient's cell phone

22  when they receive a call.  But we have asked for Caller ID data

23  going back a full year along the class definition and for all the

24  class members.  They have provided two months of information.

25  And also, they designated the Caller ID numbers as confidential.

1      MR. PEDERSON:  Your Honor, we withdrew the

2 confidentiality designation with regard to the Caller ID data

3 over a month ago.  I sent an e-mail to plaintiff's counsel with

4 the subject Withdrawal of Confidentiality Designation.

5      The bona fide error defense that Mr. Burke first

6 mentioned, the claim alleges that TBI concealed the purpose of

7 its calls by using phone numbers other than the phone number on

8 its letterhead when it would call debtors and really --

9      THE COURT:   The idea.

10      MR. BURKE:  -- this confidential information may or may

11 not rebut that assertion.

12      MR. PEDERSON:  TBI only calls debtors from numbers that

13 belong to TBI.  So the numbers use our TBI phone numbers and when

14 the number appears on someone's screen, it doesn't mislead the

15 called party to believe that one other than TBI is being called.

16 But there really is no information or procedures related to

17 whether we are, you know, trying to make sure that our numbers

18 appear on Caller ID correctly because our numbers do appear on

19 Caller ID correctly.

20      MR. BURKE:  If I understood what counsel just said --

21      THE COURT:   You have got more than one number.

22      MR. PEDERSON:  We have more than one number.  There is

23 many.

24      MR. BURKE:  Including three cell phones that they pass

25 around from collector to collector.

1          MR. PEDERSON:  I believe, your Honor, that there are two

2    numbers associated with the dialer, there are two cell phones and

3    there is a land line.

4          THE COURT:  Okay.

5          MR. BURKE:  Well, if it's not confidential anymore, that

6    moots part of the issue, but if there were any other numbers

7    during the class period that were used, we request that those be

8    produced and also responsive to the interrogatory would be the

9    dates that those numbers were used.

10          THE COURT:  That should be easy to find out.

11          MR. PEDERSON:  Your Honor, I don't think it would be a

12    problem to produce the phone numbers that were used.

13          MR. BURKE:  Judge, we also asked for statistics having

14    to do with auto dialed and prerecorded messages.

15          THE COURT:  Do they keep the statistics?  If they keep

16    them, you have to produce it.

17          MR. PEDERSON:  Well, it's -- statistics is an undefined

18    term in this discovery request.  We know what calls are placed

19    through our dialing system.  Does he want the complete contents

20    of our database?

21          MR. BURKE:  We asked for statistics, studies and

22    reports.  I suspect that the autodialer spits out a report every

23    week or every month about how many calls were completed, how much

24    money was collected, that sort of information.

25          THE COURT:  Do you have that information?  Do you keep

1  that information?

2      MR. PEDERSON:  Your Honor we have information about all

3  calls that are placed.  We're not required --

4      THE COURT:  But do you accumulate statistics on the

5  number of calls that were made for a particular period?

6      MR. PEDERSON:  Your Honor, I don't know the answer to

7  that question.

8      THE COURT:  Well, if you have it, this is discovery,

9  this is discovery.

10     MR. BURKE:  I don't know how he doesn't know if we asked

11 for it.

12     MR. PEDERSON:  What bearing, though, do undefined

13 statistics on the questions raised by this case have, whether

14 consumers are being contacted on cell phones without their

15 consent, whether the phone calls are being placed?

16     THE COURT:  Well, one thing that you know, counsel,

17 when the plaintiff gets your client for deposition, these issues

18 do come up and they should be able to refer back to statistics

19 that they keep internally.  That's one thing that they can do it

20 for.  That's pretty simple.

21     MR. PEDERSON:  We have disclosed the number of

22 prerecorded message calls that were placed to the potential class

23 members during the class time period.  I'm not sure why

24 additional statistics are --

25     THE COURT:  If, for instance, your managers are deposed

1  and they testify that they made only, let's say, a small sample

2  of calls, number of calls per months and that they only collected

3  X amount of dollars, if the statistical data that they have shows

4  something different, they should be able to question about it.

5  That's all I'm saying.  It doesn't mean you're going to get that

6  into evidence, but certainly for depositional purposes they

7  should have all this stuff.  Before they take these depositions

8  they should have all this stuff in front of them.

9         MR. PEDERSON:  And can you give us some guidance, your

10 Honor, about what production of --

11        THE COURT:   You guys are lawyers.

12        MR. BURKE:   We just want to get document request No.

13 27.

14        THE COURT:   Okay.

15        MR. BURKE:   Judge, recordings, the auto, prerecorded

16 message that the defendant left for 7,000 people, it's been

17 produced.  It was produced I think last week.  It was designated

18 confidential.  We filed a motion last night saying that this is

19 obviously, has been placed, it has been recorded on third

20 parties' voicemails over 7,000 times.

21        THE COURT:   Is it designated as confidential on a

22 protective order?

23        MR. BURKE:   Yes.

24        THE COURT:   So somebody can see it.

25        MR. BURKE:   They actually recorded it on third parties'

 1  voicemails 7,000 times at least.

 2       MR. PEDERSON:  Your Honor, I offered to withdraw the

 3  confidentiality designation.

 4       THE COURT:  Okay.

 5       MR. PEDERSON:  As long as plaintiff's counsel would

 6  agree not to use the recording for purposes unrelated to this

 7  lawsuit.  We don't want -- we simply asked that he would agree

 8  not to, for example, upload it to an Internet blog or use it in

 9  any connection other than in connection with this lawsuit.

10       THE COURT:  Or if he files another lawsuit later, you

11  want him to go back and reinvent the wheel, right?

12       MR. PEDERSON:  The purpose isn't to prevent him from

13  using the prerecorded message in another lawsuit, although I

14  can't imagine what relevance it would have in another lawsuit.

15  It's only to prevent it from being distributed for purposes

16  unrelated to this lawsuit.

17       MR. BURKE:  It's the violation itself, and it was left

18  on over 7,000 people's voice mail intentionally.  They recorded

19  it on third parties' recording devices, and now they're claiming

20  it's confidential.

21       THE COURT:  It's simply not confidential.  Okay, we are

22  going to strike the confidential designation for that.

23       Okay, what else?

24       MR. BURKE:  I think that's finally it, Judge.  We have

25  an assertion that other complaints and lawsuits have all been

 1  disclosed and we are taking them at face value, although we don't
 2  have an affidavit stating such.
 3          THE COURT:   This is the only one, right?
 4          MR. PEDERSON:  This is the only TCPA lawsuit, your
 5  Honor.
 6          THE COURT:   Okay.
 7          MR. BURKE:  Insurance policy and reservation of rights
 8  letter.  We have the insurance policy, we don't have the
 9  reservation of rights letter.
10          THE COURT:   All right, you will get all that.
11          MR. BURKE:   Thank you, Judge.
12          THE COURT:   Set it for status.  Give them 30 days to
13  turn all this stuff over.
14          THE CLERK:  By December 14th.
15          THE COURT:   I'll grant your motion in its entirety as
16  set forth during oral argument.  The discovery to be turned over
17  by December what, 17th?
18          THE CLERK:  December 14th.
19          THE COURT:   December 14th, and don't say anything about
20  fees and costs because he didn't ask for them.  My mistake there.
21          MR. BURKE:   Maybe it was my mistake.
22          THE COURT:   No.  Okay, all right, we will see you then.
23          MR. BURKE:   Thank you, your Honor.
24          THE COURT:   Is that the date we set for another status?
25          THE CLERK:  We will set it for December 14th at 9 a.m.

```
 1          MR. BURKE:   Thank you.

 2          THE COURT:   All right.

 3          *                    *                    *

 4     I certify that the above is a true and correct

 5     transcript of proceedings had in the above matter.

 6               /s/ Lois A. LaCorte

 7

 8     _____     _____
                Lois A. LaCorte                   Date
 9              Official Court Reporter

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

# Appendix 3

# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Joan H. Lefkow | Sitting Judge if Other than Assigned Judge | Susan E. Cox |
|---|---|---|---|
| **CASE NUMBER** | 10 C 1846 | **DATE** | 11/9/2010 |
| **CASE TITLE** | Joanne F. Balbarin  vs. North Star Capital Acquisition, LLC, et al | | |

**DOCKET ENTRY TEXT**

Plaintiff's motion to compel [101] is granted.  Defendant is ordered to provide information responsive to the discovery requests on or before 11/24/10.

■[ For further details see text below.]

Docketing to mail notices.
*Copy to judge/magistrate judge.

---

## STATEMENT

In this putative class action plaintiff alleges a violation of the Telephone Consumer Protection Act, 47 U.S.C. § 227, claiming that defendant's alleged use of an automatic dialing system with an artificial or pre-recorded voice that placed multiple calls to her cell phone without her express prior consent.  Defendant has alleged in an affirmative defense that plaintiff (and unnamed class members) have consented to these calls.  Plaintiff seeks to compel responses to Interrogatory No. 9 and Request to Produce No. 7.  Both of these discovery requests seek information which supports defendant's asserted "prior express consent" defense.

In an agreement, which the Court finds highly constructive in this kind of a case, the parties agreed to limit defendant's response to a fifty person random sample of the putative class.  However, defendant continues to object to this discovery.  These objections are overruled.

Defendant's primary objection is that plaintiff has not yet obtained class certification and that it should not be forced to respond to burdensome class-wide discovery unless and until she does.  This objection lacks merit for a number of reasons.  First, the district judge in this case did not bifurcate discovery here.  All discovery is ordered closed on February 9, 2011.  Further, this discovery is hardly class-wide, but limited to fifty possible class members.  We are entirely persuaded by the opinion of our colleague, Judge Nolan, that a defendant in such an action must produce documents and information regarding its prior express defense.  *Donnelly v. NCO Financial Systems, Inc.* 263 F.R.D. 500, 504 (N.D. Ill. 2009).  We note that the court in that case ordered such discovery on a class-wide basis and found that the benefit of the discovery outweighed the burden and expense.  *Id.*   In this case, plaintiff only has requested this information for a random fifty person sample.

We also find unavailing defendant's argument that it does not possess these documents itself, but will have to obtain them at great expense from third parties.  If defendant does not have documents or other information which substantiates the defense it is difficult to fathom why it interposed that defense in the first place.  If defendant cannot substantiate this defense with documents or information responsive to the interrogatory, it should say so under verification and withdraw that defense.

| STATEMENT |
| --- |
|     Defendant is ordered to provide information responsive to the discovery requests on or before November 24, 2010.  Plaintiff's motion to compel is, thus, granted [dkt 101]. |

# Appendix 4

# UNITED STATES COURT OF APPEALS FOR THE SEVENTH CIRCUIT

Everett McKinley Dirksen United States Courthouse
Room 2722 - 219 S. Dearborn Street
Chicago, Illinois 60604



Office of the Clerk
Phone: (312) 435-5850
www.ca7.uscourts.gov

## ORDER

March 10, 2011

### BEFORE

FRANK H. EASTERBROOK, *Chief Judge*

JOHN L. COFFEY, *Circuit Judge*

TERENCE T. EVANS, *Circuit Judge*

| No.: 11-8004 | IN RE: NELSON, WATSON & ASSOCIATES LLC, Petitioner |
|---|---|

**Originating Case Information:**

District Court No: 1:10-cv-01846
Northern District of Illinois, Eastern Division
District Judge Elaine E. Bucklo

The following are before the court:

1. **PETITION FOR PERMISSION TO APPEAL OF NELSON, WATSON & ASSOCIATES, PURSUANT TO FED.R.CIV.P. 23(F) AND FED.R.APP.P. 5**, filed on February 4, 2011, by counsel for the petitioner.

2. **RESPONDENT BALBARIN'S RESPONSE TO PETITION FOR PERMISSION TO APPEAL OF NELSON, WATSON & ASSOCIATES, PURSUANT TO FED.R.CIV.P. 23(f) AND FED.R.APP.P. 5**, filed on February 22, 2011, by counsel for the respondent.

3. **REPLY IN SUPPORT OF PETITION FOR PERMISSION TO APPEAL OF NELSON, WATSON & ASSOCIATES, LLC**, filed on March 2, 2011, by counsel for the petitioner.

4. **CIRCUIT RULE 28(E) SUPPLEMENTAL AUTHORITY**, filed on March 3, 2011, by counsel for the petitioner.

**IT IS ORDERED** that #1 is **DENIED**.

# Appendix 5

1             IN THE UNITED STATES DISTRICT COURT
              NORTHERN DISTRICT OF ILLINOIS
2                    EASTERN DIVISION

3   NICHOLAS MARTIN, on behalf      )
    of himself and others          ) Docket No. 10 C 3494
4   similarly situated,            )
                                    ) Chicago, Illinois
5                  Plaintiff,       ) December 7, 2010
                                    ) 9:30 a.m.
6          v                        )
                                    )
7   CCH, Incorporated,              )
                                    )
8                  Defendant        )
                                    )
9

10                TRANSCRIPT OF PROCEEDINGS
           BEFORE THE HONORABLE MARTIN C. ASHMAN
11

12  PRESENT:

13  For the Plaintiff:       ALEXANDER H. BURKE
                             Burke Law Offices, LLC
14                           155 North Michigan Avenue
                             Suite 9020
15                           Chicago, Illinois  60601

16  For the Defendant:       SUSAN E. GROH
                             77 West Wacker Drive
17                           Suite 4100
                             Chicago, Illinois  60601

18

19
    (TRANSCRIBED FROM DIGITAL RECORDING.)
20

21
    Court Reporter:          Lois A. LaCorte
22                           219 South Dearborn  Room 1918
                             Chicago, Illinois 60604
23                           (312) 435-5558

24

25

1      THE CLERK:  10 C 3494, Martin v CCH.

2      MR. BURKE:  Good morning, Judge, Alexander Burke for the

3   plaintiff.

4      MS. GROH:  Good morning, your Honor, Susan Groh on

5   behalf of the defendant CCH.

6      THE COURT:  Good morning.  All right, we have

7   plaintiff's motion to compel.

8      MR. BURKE:  That's right, Judge.  We issued discovery

9   about a month ago and I have gotten almost nothing.  We tried

10  to work through this with counsel, several long telephone

11  conversations, long e-mails, still have nothing, so we moved

12  to compel.  There are five categories of requests that --

13     THE COURT:  Let's take them one by one.

14     MR. BURKE:  I would like to start with Section C, which

15  has to do with the dialer and the prerecorded messages and the

16  procedures that the defendant has to make the auto dialed and

17  prerecorded calls.

18     Probably the most fundamental request -- this is on page

19  10 of 15 of our motion -- probably the most fundamental

20  request is interrogatory 5, which asks the defendant to

21  explain their policies, practices, and procedures regarding

22  the use of predictive dialers and prerecorded messages going

23  back to when they began using such.  The defendant provided no

24  substantive response to this interrogatory.

25     MS. GROH:  Judge, if I may, plaintiff served extensive

1    discovery requests on the defendant before we even filed our

2    answer in this case.  As a result, plaintiff's discovery is

3    overbroad, unduly burdensome, and irrelevant.  To a large

4    extent --

5          THE COURT:  Would you speak a little louder.

6          MS. GROH:  Sure.

7          THE COURT:  And speak into the mike.

8          MS. GROH:  Sure.

9          THE COURT:  Thank you.

10         MS. GROH:  As I was saying, Judge, plaintiffs served

11   extensive discovery requests on defendant before we even had a

12   chance to answer the complaint.  As a result, most of this

13   discovery is extremely broad and irrelevant.

14         Plaintiff requested a Rule 37 conference, which we spent

15   several hours on the phone discussing various issues.  In

16   those conversations we provided plaintiff with detailed

17   information about how our calling campaigns work and took him

18   through the steps of that.  As a result of these

19   conversations, plaintiff has served us with a second set of

20   discovery which are much more narrowed and focused than his

21   first set of discovery.

22         THE COURT:  Is it on the same subject?

23         MS. GROH:  Largely, yes, your Honor.

24         MR. BURKE:  Some of it is on the same subject, but I

25   think it's two interrogatories and three document requests or

1    something.  I mean, I think --

2         THE COURT:   Do you have another discovery request that

3    is on this subject?

4         MS. GROH:   Yes, your Honor.

5         THE COURT:   I'm asking him.

6         MR. BURKE:   I think that it touches on some of the

7    subjects that are requested in interrogatory 5, but I don't

8    think that it nullifies interrogatory 5.  I mean, I think this

9    is --

10        THE COURT:   How many times do you want them to answer it

11   though?

12        MR. BURKE:   If I get a full response to 5, I'll withdraw

13   the second set of discovery.

14        THE COURT:   Well, but what she is saying is if you come

15   up with the second set, the answer to the second set will

16   suffice for this.

17        What does your second set of interrogatories, what does

18   it ask about this subject?

19        MR. BURKE:   I don't have it with me, Judge.

20        THE COURT:   Well, do you have it with you?

21        MS. GROH:   I do have it with me, your Honor.

22        THE COURT:   All right.  Let's hear what it says.

23        MS. GROH:   As an example, as plaintiff is indicating,

24   his request relating to the dialer, he asks for every single

25   document that relates in any way to our telephone equipment.

1    In our conversations --

2        THE COURT:   This one says for you to identify and

3    explain the written and unwritten policies, practices, et

4    cetera.

5        MS. GROH:   Sure, and in our conversations pursuant to

6    Rule 37 plaintiff clarified that he was looking for the dialer

7    manuals.   In his second set of requests he specifically

8    requests the dialer manuals, which we are happy to produce

9    when they are due on December 20th, which is two weeks from

10   today.

11       THE COURT:   Do you agree that that's what you wanted

12   here?

13       MR. BURKE:   I mean, Judge, I issued that second set of

14   discovery to appease the defendant.   I mean, we had a long

15   discussion about whether document request 19 that's on the

16   same page as interrogatory 5 sufficiently asks for telephone

17   manuals.   It asks for all manuals, communications and other

18   documents related to telephony, hardware, software and other

19   telephone equipment.   I mean, these requests are reasonable.

20   I'm asking him -- because these are the most basic requests.

21       THE COURT:   This is the point that's being made.   The

22   point that's being made is you have got a more restrictive

23   apparently interrogatory or document request on the same

24   subject and that, as a result of your conference, that was

25   something you agreed to that that's what you wanted.   So why

1  do you want this?

2      MR. BURKE:  No, Judge, I didn't agree that the second set

3  of discovery was going to supersede the first set of

4  discovery.  I mean, when I issued those requests I was still

5  seeking responses to these requests for which I have no

6  responses.

7      I'm willing at this point to withdraw the second set of

8  discovery and seek full responses to this discovery.

9      MS. GROH:   Judge, I would suggest that we wait two weeks

10 and let us respond to the second set of discovery and if

11 plaintiff still has some issue with our responses, then he can

12 renotice this motion, but at this time I believe it's

13 premature to address these issues when our discovery isn't due

14 for two weeks.

15     MR. BURKE:  This discovery has been due for three months.

16 And I have been working for three months --

17     THE COURT:   He has just withdrawn his second set, so

18 your argument with regard to the second -- the second set no

19 longer exists.  It is withdrawn as of record.

20     All right.  Now, why can't you answer Interrogatory

21 No. 5?

22     MS. GROH:   Interrogatory No. 5 is overly broad and

23 unduly burdensome, and that's the basis of our --

24     THE COURT:   Explain the written policies in document

25 request No. 5, come up with all the documents, why can't you

1  do that?

2      MS. GROH:   As we objected, your Honor, this request is

3  asking for every single document.  It's not tailored at all in

4  any way to the circumstances of this case.  As we have

5  identified to the plaintiff, we don't have any class

6  information so his claim is based on one phone call that was

7  made to the plaintiff.  Based on that, this is completely

8  overbroad.

9      THE COURT:   Well, this is a putative class action, isn't

10  it?  It's a class action or an attempt at a class action.  So

11  you're saying this is not relevant?  What is your answer?

12      MS. GROH:   Our answer is that it's overbroad.  He is

13  asking for every single policy --

14      THE COURT:   I don't think it's overbroad at all.  The

15  motion to compel interrogatory No. 5 and document request No.

16  5 is granted.  Okay, next.

17      MR. BURKE:   Let's see, document request 3, a copy of the

18  recordings that the defendant used with its dialer to make

19  these unsolicited telephone calls.

20      MS. GROH:   I'm sorry, what number was that?

21      MR. BURKE:   Document request 3.  Just by matter of

22  background, your Honor, the TCPA portion of this case has to

23  do with prerecorded telephone solicitations to purchase or to

24  sell tax software.

25      THE COURT:   Yes, I read the complaint.

1    MR. BURKE:  Okay.

2    MS. GROH:   Our response to document request No. 3 in our

3    Rule 37 conference with plaintiff is that we have no recording

4    of this phone call.

5    THE COURT:   Well, did you answer to that effect?

6    MS. GROH:   We indicated to plaintiff that we would

7    supplement our answer to that effect.

8    MR. BURKE:  Judge, I suspect that we have a little bit --

9    and maybe I'm wrong, but a little bit of sharpshooting going

10   on here.  What counsel just said is they have no recording of

11   the telephone call to plaintiff, but what we're asking for

12   here is a copy of the recordings that they used with their

13   dialer during the class period.

14   MS. GROH:   To the plaintiff's phone number.

15   MR. BURKE:  Or any other person in the class.

16   THE COURT:   It says and for the call to any person

17   responsive to interrogatory No. 3.

18   MR. BURKE:  Which is the class list for the

19   interrogatory.

20   THE COURT:   So that's a recording more than just to the

21   plaintiff's telephone number.

22   MS. GROH:   We indicated to plaintiff that we would agree

23   to supplement this.

24   THE COURT:   So you agree that you will provide this?

25   MS. GROH:   My understanding is that we have no data on

1   this, so we would supplement our response to state that.

2       THE COURT:   Then what do you mean you're going to

3   supplement?

4       MS. GROH:   We would supplement our response to the

5   interrogatory -- to the request to produce to state that there

6   is no copy of any recordings responsive to this request.

7       THE COURT:   Well, if there is no -- it's hard to believe

8   that there is no copy.  So I think what you need to do is also

9   provide, have somebody from the company provide what search

10  they made, what happened to any recordings, when it happened.

11  You have got to get into the detail of the search and the

12  detail of whatever happened to these recordings or this

13  recording.

14      MR. BURKE:   I suspect that where they're coming from is

15  they're going to say "Well, we don't know which recording we

16  used with which class member."  And I think that the document

17  request -- or maybe they just destroyed the recording, I'm not

18  sure.

19      THE COURT:   I don't know, and there is no point in your

20  speculating or the court speculating.  I want a detailed

21  response as to what happened to any recordings, when it

22  happened, under whose authority it happened, what the search

23  consisted of, and any other detail with regard to why these

24  recordings -- why you don't have these recordings at this

25  time.

1      MS. GROH:  Sure, Judge.

2      THE COURT:  Next.

3      MR. BURKE:  Judge, skipping over 13 because I think that

4  it's included in document request 15.

5      THE COURT:  Okay.

6      MR. BURKE:  All documents, contracts, e-mails, or

7  agreements concerning use of your predictive dialer for

8  recorded messages.

9      THE COURT:  E-mails or agreements.  I don't even

10  understand what you mean there.  What agreements are you

11  referring to?

12      MR. BURKE:  Well --

13      THE COURT:  You buy an autodialer and it dials.

14      MR. BURKE:  Well, when we filed the case I wasn't sure if

15  they did the dialing in-house or out of house, so we have

16  learned at least through counsel's representation to Judge

17  Dow, not through these discovery responses, that the defendant

18  has an in-house dialer.  So you know, if there are

19  communications with -- pardon me, contracts, maybe there is a

20  contract for purchase of the dialer or maintenance of the

21  dialer.  Perhaps if there is a third-party that's --

22      THE COURT:  What's the relevance of that?

23      MR. BURKE:  Well, say, for example, they have a

24  third-party vendor maintain the dialer and that third-party

25  vendor has access to or has downloaded data regarding which

1    calls it made to whom at what time, the very data that the

2    defendant says does not exist, that would be -- the identity

3    of that third-party would be revealed in the response to

4    document request 15.

5         Similarly, I suspect, although counsel says it's not

6    true, that when sales associates wanted to do a dialer

7    campaign, they e-mailed somebody saying "Hey, I want to do

8    this dialer campaign, you know, please, have the dialer call

9    this set of people from the database," that information would

10   be probably in an e-mail or a memo.

11        Defendant tells me that the sales agents walked over to

12   this guy Brian Holbrook at the office in Atlanta and verbally

13   asked for a dialer campaign to be done and the dialer campaign

14   was done without any, any documentation at all.

15        MS. GROH:   To that, Judge, as we told plaintiff in our

16   Rule 37 conference, mostly what was done was, you know, in

17   sales everything has to be prompt and fast.  It was mostly

18   face-to-face contact.  There may have been some e-mails that

19   were sent.  However, the information that was contained in the

20   e-mails was contained in scripts that were run against the

21   database, which we have, we have copies of the script and

22   we're happy to provide that to plaintiff's counsel.  They're

23   more inclusive and more responsive than the e-mails

24   themselves, so we feel that those would be irrelevant.

25        THE COURT:   I think document request 15 is not too broad

1    and I think it ought to be answered.  It certainly is relevant

2    as to what was told to who with regard to doing these dialings

3    and, of course, what the script was.  So all documents -- I'm

4    not so sure that the purchase of a dialing system, I don't

5    think you need to provide any contract with regard to that,

6    but any other use of the dialing system, documents, contracts,

7    e-mails or agreements, that certainly is relevant and not very

8    broad at all.  So the motion to compel document request 15 is

9    granted.  What's next?

10        MR. BURKE:  Skipping down to 19, please.

11        THE COURT:   Okay.

12        MR. BURKE:  Manuals, communications, other documents

13   relating to the telephony hardware, software and other

14   telephone equipment.  What I understand --

15        THE COURT:   Is that a -- telephony, is that on purpose?

16        MR. BURKE:  Yes, I think that's a word.

17        THE COURT:   Is it really a word?

18        MR. BURKE:  Telephony.

19        THE COURT:   Telephony.

20        MR. BURKE:  Yes.

21        THE COURT:   I'll go look it up.

22        MR. BURKE:  What we are looking for here, Judge, is --

23   well, based on Rule 37 talks we understand that there is some

24   database from which the telephone numbers that the dialer

25   called is taken.  We understand that there is a dialer and

1   that there is some process by which the -- that the sales

2   agents asked Brian Holbrook to make these calls.  Of course,we

3   don't have the full responses to interrogatory 5 so I don't

4   have anything sworn that says that this is what happens, but

5   this is what has been explained to me.

6        In order to hire an expert, which I think I'm going to

7   have to do in this case to help me sort through this, through

8   this E discovery, I need to know what type of telephones they

9   have, what kind of dialer they have, what kind of database

10  this is that operates with the dialer to make these calls, and

11  how these things interact.  So that's the primary basis for

12  the document request.

13       MS. GROH:   If I may respond to that, your Honor, just,

14  as plaintiffs describe in detail, that's the type of discovery

15  request that we could respond to, but in this discovery

16  request where he is asking for all manuals, communications and

17  other documents related to all of our telephone software and

18  hardware, he is not limiting it to the dialer in issue.  It's

19  all --

20       THE COURT:   The motion to compel is granted with regard

21  to the automatic dialing system rather than all telephones.

22       MR. BURKE:  So the telephone --

23       THE COURT:   It excludes regular telephone calls.

24       MR. BURKE:  Okay, we will work with that.  I think that

25  there may be overlap, so there --

1    THE COURT:   Well, yes, certainly there may be overlap,

2    but you're not entitled to all of their information regarding

3    their regular telephone system.

4    MR. BURKE:   I don't care about that stuff.

5    THE COURT:   Just the auto dialling.  So the motion to

6    compel is granted to that limited extent only.  Next.

7    MR. BURKE:   Going back to section 8 please, page 6.

8    THE COURT:   Yes.

9    MR. BURKE:   These materials have to do with the class

10   list and documents and data concerning the class members.

11   THE COURT:   Are you talking about interrogatory 3 or

12   what?

13   MR. BURKE:   Interrogatory 3 -- beginning with

14   interrogatory 3, your Honor.

15   THE COURT:   All right.  I'll read it.

16   (Pause)

17   THE COURT:   Counsel, why don't you respond.

18   MS. GROH:   As we have indicated to plaintiff's

19   counsel --

20   THE COURT:   Pardon?

21   MS. GROH:   As we have indicated to plaintiff's counsel

22   in our Rule 37 conversations, we do not have any responsive

23   class data.

24   THE COURT:   You don't have the intended recipient, you

25   don't have communications attempted and completed, from the

1  recipients of these auto dialers?

2      MS. GROH:  No, your Honor, there is no business reason

3  for us to keep that data.  So they didn't keep it.  So we have

4  no records of phone calls made within this class period.

5      THE COURT:  How about the people who responded?  Didn't

6  somebody respond and buy your client's material?

7      MS. GROH:  I can't say.

8      THE COURT:  They were auto dialed and they responded.

9  You can't tell me you don't know them.

10      MS. GROH:  The records that we have don't, don't

11  indicate that one way or the other.  We don't have any records

12  to show the calls that were made.

13      MR. BURKE:  Furthermore, I suspect that they have a Do

14  Not Call list subject to the federal Do Not Call regulations.

15  Most states have similar Do Not Call regulations.

16      THE COURT:  But you're asking here for the intended

17  recipient and the communications to and from the person and

18  where they got the personal information, including the e-mail

19  and telephone number for these people.

20      MR. BURKE:  Yes.

21      THE COURT:  You don't have any documents with regard to

22  that?

23      MS. GROH:  I'm telling you that we can't, we can't

24  identify what phone calls were made from the dialer and we

25  have indicated this to plaintiff's counsel and we are willing

1   to supplement --

2       THE COURT:   So you could be dialing these people over

3   and over and over again, right, since you don't know who you

4   dialed in the first place or the second place.

5       MS. GROH:   That very well could be because that's not

6   information that we retain.

7       THE COURT:   That's very difficult to believe.  I want a

8   detailed exposition of how this works and why you do not have

9   the intended recipient of auto dialing.  You didn't dial

10  everybody in these states, did you?  It was limited in some

11  fashion.  Where did you get that limitation from?  You didn't

12  dial everybody, did you?

13      MS. GROH:   No, we had a database that had prospective

14  customers, existing customers.

15      THE COURT:   So you do have a list of prospective

16  customers.  That's the source.

17      MS. GROH:   But we do not have information of who on that

18  list were called.

19      MR. BURKE:   But they do have these database queries.

20      MS. GROH:   Yes, we have the database queries and we have

21  a database but even if you cross reference them it won't

22  indicate whether a phone call was made to that person.

23      THE COURT:   So once again, I say so that means you could

24  dial the same person twice or three times or ten times.

25      MS. GROH:   That very well could be.

1    THE COURT:  All right.  I want the database and I want

2    you to, and to produce the database and a detailed exposition

3    of how this works.

4    MR. BURKE:  I suspect that there are backup tapes or

5    something about the database that might help us recreate what

6    it looked like when these calls were queried.

7    MS. GROH:  We have run this down from two different

8    angles, your Honor.  We have looked at what was preserved and

9    then we have looked at what can be recreated, and as I have

10   said before, what was preserved is nothing, there is no

11   business reason for them to keep this data.

12   THE COURT:  Well, you mean there was some of this

13   information and it wasn't preserved?

14   MS. GROH:  There were calls that were made to --

15   THE COURT:  There were calls that were made and the

16   second after the call was made you didn't know to whom it was

17   made?

18   MS. GROH:  The way the dialer worked is it was

19   refreshed.  If it was refreshed, then the numbers that were

20   loaded in the dialer were deleted, all the records were

21   deleted, or if it was not refreshed, after 30 days it just

22   overwrote over itself.

23   So there is -- there is no compelling business reason for

24   us to preserve any of the data from the dialer.  What we have

25   done is, you know, try to figure out what was preserved, what

1  could be on the tapes, which is nothing, and then we have

2  tried to recreate what numbers were called based on what we

3  have.  There are a number of deficiencies with that process,

4  though, and like I said before, you can run the scripts

5  against the current database that we have.  However, we don't

6  have a historic database to indicate what calls -- what was in

7  the database at the time that these calls were made within the

8  class period.

9      And although we have the scripts, if you cross reference

10  the scripts against our current database, that still doesn't

11  show whether or not a call was made, it just shows that a list

12  was made based on that information.

13      THE COURT:  Well, take us through the list, the list

14  from which everything was made and the entire process --

15      MS. GROH:  We would be happy to do that --

16      THE COURT:  -- because it's difficult to believe that a

17  company would not keep track of who they called.  It's very

18  difficult to believe.

19      MS. GROH:  I understand that, but as -- the way this

20  business worked is they kept track of their customers, their

21  existing customers was very important to them, but prospective

22  customers were not as significant for them to keep track of.

23  So that wasn't something --

24      THE COURT:  But you would think that a company would

25  then eliminate them so that they wouldn't bother -- they

1   wouldn't call them again, they wouldn't -- they wouldn't have

2   any expense with regard to promoting those prospects.

3        MS. GROH:   And that's something that did happen within

4   the database.  The database itself was constantly changing.

5   People were kicked out, people were added in, depending on --

6        THE COURT:   But the next day suppose you told the

7   database or you told the machine do 10,000 others.  Did the

8   machine know who it did the day before?

9        MS. GROH:   My understanding is no, your Honor, but if a

10  sales person had reached out to an individual who said "Please

11  don't call meany more," it would have kicked that person out

12  of the database.  So that individual might not be in the

13  database anymore is my understanding of how it worked.  We are

14  happy to detail this in our supplemental response to this

15  interrogatory.

16       THE COURT:   Well, all right.  Make a very detailed

17  response as to how it works and we will take it from there.

18  Next.

19       MR. BURKE:   I suspect that the discussion that we just

20  had would be the same as to document request 37 and document

21  request 12, both on Page 6.  Again, we are trying to figure

22  out who they called.

23       THE COURT:   Let me ask you, the automatic dialer, does

24  the telephone company provide these for nothing?  Do you get

25  billed by a telephone company?

1      MS. GROH:   It's a phone record, so we --

2      THE COURT:   So you get billed.  So the telephone company

3  has copies of who you called, do they not?

4      MS. GROH:   We have run down that angle as well, your

5  Honor.  The way it worked is we had an internal switch on our,

6  at our company so that outbound calls all came from the same

7  number, the same three numbers, and there is no way to tell if

8  the call was made from the dialer or if the call was made from

9  a salesperson's desk.

10     THE COURT:   Well, then let's include all the calls.

11 Let's include all the calls.

12     MS. GROH:   But the fact that --

13     THE COURT:   I would suspect that the regular telephone

14 calls made by people are way less than the automatic dialing,

15 right?  They would have to be.

16     MS. GROH:   I don't know if we can say that for certain,

17 Judge, but there is no way for us to tell which calls were

18 made from, you know, a salesperson to his wife or made from --

19     THE COURT:   Well, maybe there is no way to tell at the

20 beginning, but maybe some further investigation will be able

21 to figure that out.  All the telephone calls under these

22 circumstances, you provide this information on all the

23 telephone company -- all the telephone calls out of this

24 company.  And if that is too inclusive, then such is life.

25 But it would include everyone who was called.

1     MS. GROH:    In addition to --

2     THE COURT:   Well, that's what these interrogatories are

3   looking for is who was called, and who was called is in that

4   list.

5     MS. GROH:   Well, it should be narrowed to who was called

6   from the dialer.

7     THE COURT:   Well, that would be nice, but you're saying

8   you can't do that.  Then give us the entire list and let him

9   worry about who was called and who wasn't called.  So the

10   motion with regard to document request 12 is granted.

11     Okay, next.

12     MR. BURKE:   Page 7, Judge, affirmative defenses.  I would

13   like to skip to 11 because I think 4 is subsumed in 11, which

14   is an interrogatory that asks for the facts and law that

15   supports their affirmative defenses.

16     THE COURT:   Counsel.

17     MS. GROH:   In our Rule 37 conferences with the plaintiff

18   we told him that our main affirmative defense or defense at

19   this time is that we got these phone numbers, we got the

20   plaintiff's phone number from the IRS.

21     THE COURT:   How do you get the phone numbers from the

22   IRS?  I saw that in these papers.  I'm interested.  How do you

23   get telephone numbers from the IRS?

24     MS. GROH:   It was pursuant to a FOIA request.

25     THE COURT:   Pardon?

1      MS. GROH:   It was pursuant to a FOIA request to the IRS.

2      THE COURT:   You mean you can get telephone numbers from

3  the IRS, telephone numbers of taxpayers so you can call them

4  from the IRS?

5      MS. GROH:   Correct, your Honor.  Our business is selling

6  tax software to businesses.

7      THE COURT:   Yes.

8      MS. GROH:   We got a list of businesses that filed a

9  certain number of tax returns on behalf of individuals.  So

10  our marketing was towards businesses.

11      THE COURT:   And you get that from the IRS.  Does that

12  mean that these people consented?

13      MS. GROH:   Our argument is that these are businesses and

14  not individuals.

15      THE COURT:   And businesses have consented that their

16  income tax return information, some information from the

17  income tax return can be disseminated by the Internal Revenue

18  Service?

19      MS. GROH:   Our position is that businesses are not

20  covered by the TCPA or the Do Not Call list, that by holding

21  out a phone number as your business, you're consenting for the

22  world to call you in that capacity.

23      THE COURT:   Maybe they're not covered by the Do Not Call

24  list.  What I'm talking about is if you're running a law firm,

25  that's a business, okay?  You file an income tax return.  Are

1　you consenting that your telephone number can be provided to

2　John Fisher here by filing an income tax return?

3　　　　MS. GROH:　I think the issue that we are arguing is a

4　little different than that, but that would be subject to the

5　FOIA document request, which is something that is exactly what

6　can be done.

7　　　　THE COURT:　I'm trying to understand how this works so I

8　can rule fairly on these discovery requests and I still can't

9　understand, it's beyond me that the IRS would provide

10　telephone numbers of its taxpayers, whether they're corporate

11　or individual, to anybody.

12　　　　MS. GROH:　That's exactly what happens and that's what

13　happened here.　But our defense is a little bit different.

14　It's that these are businesses that were holding themselves

15　out under these numbers and those are the numbers we called,

16　and as a result of that --

17　　　　THE COURT:　And did they consent?

18　　　　MS. GROH:　We believe they did consent by using these

19　numbers as their business numbers, which would not be

20　covered --

21　　　　THE COURT:　They consented by filing the income tax

22　return which contained their telephone number?

23　　　　MS. GROH:　Holding themselves out as a business.　We

24　believe that you can contact businesses in that capacity,

25　which would not be covered by the TCPA or the Do Not Call

1  list.

2  THE COURT:  Holding -- once again, your law firm is a

3  business.  You file an income tax return with the government.

4  Are you by so doing -- you hold yourself out as a business,

5  are you by so doing consenting that the IRS provide or

6  disclose your telephone number?

7  MS. GROH:  Well, the IRS is a separate entity.  We would

8  say --

9  THE COURT:  Yes, I know it's a separate entity.

10  MS. GROH:  -- you are consenting.

11  THE COURT:  I know it's a separate entity, but I'm

12  talking about the consent part of the taxpayer.  Have you by

13  so doing consented?

14  MS. GROH:  We would say yes, your Honor.

15  THE COURT:  All right.

16  MR. BURKE:  There are six affirmative defenses, Judge.

17  We are asking for them to explain them.

18  THE COURT:  All right.  Well, you talk about affirmative

19  defenses that haven't yet been made.  I don't think they need

20  to explain those.

21  MR. BURKE:  Well, not now.

22  THE COURT:  No.  So why can't you respond to that?

23  MS. GROH:  We indicated to plaintiff's counsel that we

24  would supplement our response to state that our defense is

25  that the plaintiff in this case --

1    THE COURT:  So you will respond to it?

2    MS. GROH:  Yes.

3    THE COURT:  So the motion to compel with regard to

4  Interrogatory No. 4 is granted in that any objections thereto

5  are being waived.  The next one.

6    MS. GROH:  If I could just clarify one point, your

7  Honor, we indicated that we would supplement to state the

8  defense I just explained, that the plaintiff consented by

9  holding out this number as its business number.  Beyond that,

10  our investigation continues and at this time we can't identify

11  every affirmative defense or every defense that we may have,

12  every argument --

13    THE COURT:  No, no, you don't have to explain any

14  affirmative defenses that you have not made.

15    MS. GROH:  Okay.  When you said, waiver, Judge, I just

16  wanted to clarify that we weren't waiving --

17    THE COURT:  Only affirmative defenses that are stated in

18  your answer, in your pleading.

19    Okay, next.  Anything else?

20    MR. BURKE:  Document request 7, documents that concern

21  any person whose cell phone was called using the dialer, could

22  be persons who were within the class as defined.

23    MS. GROH:  And again, your Honor, we don't have any

24  class information, and as far as the --

25    THE COURT:  Just a moment, just a moment.  Before you

1    respond, let me read it.

2        (Pause)

3        THE COURT:  Okay, your response is?

4        MS. GROH:  As we stated before, we have no information

5    about the class, what phone calls were made to these class

6    members.  As far as the prior express consent, it's the same

7    defense that we stated before.

8        THE COURT:  In other words, what you're saying is you

9    have no express consent from anybody, right?

10       MS. GROH:  We are saying that we don't know who was

11   called so there is no way for us to say --

12       THE COURT:  Go through your files of all your customers

13   and tell us who made an express consent, "express" meaning

14   they consented to you, they sent you a letter saying "It's

15   okay for you to call me."

16       MS. GROH:  And as I have explained before, we don't have

17   any class data.  We can't indicate what calls were made to

18   individuals and there is no way for us to track that down.

19       THE COURT:  You can indicate as to those people who you

20   had contact with who responded to the autodialer.

21       MS. GROH:  And we don't have a record of that

22   information.  But we do have the same --

23       THE COURT:  Now, wait a minute, wait.  You also don't

24   have a record -- the autodialer calls John Jones Company.

25   John Jones Company calls you and says "I'm interested in what

1  the autodialer said." There is no follow-up, there is no

2  record?

3     MS. GROH:   There is no way for us to track that down.

4     THE COURT:   Why not?  Can't you look in a file?  A file

5  was created when somebody called and affirmatively responded

6  to the promotion.  You can't tell me you have no records of

7  that.  That's how you make your living.

8     MS. GROH:   If someone called us in response to a

9  promotion, then there was no auto dial call.  Maybe I'm not

10  following you, Judge.

11     THE COURT:   If somebody called you and said "I was

12  called by your company, I'm interested," you have a record of

13  that, don't you?

14     MS. GROH:   If that prospective customer became a

15  customer, then that entry would be in our --

16     THE COURT:   Either became a customer or had

17  conversations regarding getting to be a customer.

18     MS. GROH:   As far as tracking how that occurred --

19     THE COURT:   No, that isn't what this asks.  What this

20  asks is any documents with any of these people that showed

21  express consent to call them.  I think that's what it asks

22  for, right?

23     MR. BURKE:  Yes.

24     THE COURT:   What you're saying is you have no such

25  documents?

1        MS. GROH:    Correct.

2        THE COURT:    Okay.  Well, why don't you answer that way.

3    If that's the truth, then answer that way.

4        MS. GROH:    And we have indicated to plaintiff that we

5    would supplement these responses accordingly.

6        MR. BURKE:    No documents supporting the affirmative

7    defenses, fine with us.

8        THE COURT:    Okay, what else?

9        MR. BURKE:    Page 11, Judge, information concerning the

10    plaintiff.  The defendant has refused to provide us with

11    information that it has regarding the plaintiff.  We have

12    asked for that stuff.  They're saying we don't get it.

13        MS. GROH:    We identified one document that we have that

14    has the plaintiff's name, his address, his phone number, the

15    name of his business.  Before we produce this to the

16    plaintiff, we would like to have it covered by the protective

17    order.

18        THE COURT:    What protective order?

19        MS. GROH:    We have been working on getting a protective

20    order entered in this case.

21        THE COURT:    What do you need a protective order for

22    plaintiff's information?  Plaintiff waives that, doesn't

23    plaintiff?

24        MR. BURKE:    As long as they don't put it in the public

25    record for discovery purposes, absolutely.

1    MS. GROH:   Out of an excess of caution, the plaintiff is

2  suing --

3    THE COURT:   Out of an excess -- it's excessive caution,

4  not an excess of caution.  You have -- if I tell you "Look,

5  this is my telephone number, you can tell John Jones my phone

6  number and you can tell John Jones everything you know about

7  me," you need a protective order after that if the party says

8  do it?

9    MS. GROH:   In this case the plaintiff is suing us for

10  violation of his privacy.  Out of an excess of caution it

11  would be our preference to designate that document as

12  confidential.

13    THE COURT:   The motion to compel on that is granted.

14  You give them all information that you have.  You can work out

15  protective orders generally, but with regard to plaintiff's

16  information that plaintiff is requesting, that's a ridiculous

17  position.  It is ridiculous.  The plaintiff wants you to tell

18  the plaintiff what information you have on the plaintiff.

19    MS. GROH:   Okay.

20    THE COURT:   And you have an excess of caution --

21  baloney.  Next.

22    MR. BURKE:   Page 12, Judge, materials bearing on

23  willfulness.  Treble damages are available if we can prove

24  that the violation is willful.  These requests are designed to

25  show that the defendant knew about the TCPA and made these

1  calls anyway.

2      THE COURT:   Complaints, written complaints, lawsuits.

3      MS. GROH:   We object to this, your Honor.

4      THE COURT:   Pardon?

5      MS. GROH:   We object to this.  Any complaint that was

6  filed against defendant does not have any bearing on this

7  case, it would never be admissible in court.  And it's -- it's

8  just plainly irrelevant and overbroad.

9      THE COURT:   I disagree.  If the complaints are the same

10 or similar, that somebody was called without their permission,

11 that shows knowledge, that shows intent, that shows or may

12 show -- all of these things may tend to show willfulness.

13 Willfulness has something to do with punitive damages.

14     MS. GROH:   Your Honor, if I may, the, just the fact that

15 a plaintiff lodged an allegation against the defendant would

16 not bear on willfulness --

17     THE COURT:   Oh, no, it's not --

18     MS. GROH:   That case could be dismissed, that case could

19 have been subject to Rule 11 sanctions.

20     THE COURT:   That's very true, that's very true, but we

21 are not talking about admissibility into evidence right now,

22 we are talking about discovery.  How is he to know what may be

23 admissible and what may not be admissible unless he has the

24 information?

25     MS. GROH:   I would again say that this is overbroad and

1   perhaps a judgment that was entered against the defendant in a

2   circumstance similar to this could be relevant to willfulness,

3   but as far as every allegation --

4        THE COURT:   Suppose you settled 10,000 of these

5   complaints individually.  You mean to say -- so there is no

6   judgment.  Isn't that potentially relevant?

7        MS. GROH:   We would say no, your Honor.

8        THE COURT:   I disagree with you.  I think it's

9   potentially relevant, the multiplicity -- I don't know if it

10  is and I'm not ruling that it is, don't get me wrong.  I'm not

11  ruling that it's admissible.  What I am ruling is first you

12  have to get the facts.  Once you get the facts, you will know

13  whether something is admissible or not.  It may lead to

14  admissible evidence and that's the standard.  Therefore, the

15  motion to compel with regard to that is granted.

16       MR. BURKE:   So that would be, Judge, request 23, 24, 25

17  is similar, your Honor, it asks for documents from any source

18  concerning the legality or propriety of making dialer calls.

19       THE COURT:   I would say all documents from any source

20  other than the defendant's own lawyers.

21       MR. BURKE:   They have already told us that there are no

22  such documents.

23       THE COURT:   Pardon?

24       MR. BURKE:   They have told us that there are no such

25  documents, no documents subject to privilege.

1     THE COURT:  All right.  So -- no such documents subject

2  to privilege.

3     MR. BURKE:  That's right, they put that in their papers

4  that there are no privileged documents.

5     THE COURT:  Motion to compel request No. 5 is granted.

6     MR. BURKE:  25, your Honor?

7     THE COURT:  Yes.

8     MR. BURKE:  Okay.  Documents that discuss defendant's

9  compliance or lack of compliance with the TCPA.

10     MS. GROH:  Again, your Honor, we will argue that this

11  does not bear on willfulness.  Perhaps if this was an FDCPA

12  case and there was a bona fide error defense, it could be

13  relevant, but as far as this case goes, the compliance or lack

14  of compliance with the policies and procedures in this regard

15  are not relevant and this motion should be denied.

16     MR. BURKE:  It's the same thing as with the complaints.

17  I mean, if you have got a hundred e-mails that were sent a

18  month before the autodialer called the plaintiff, it shows

19  that the defendant knew that they were taking a chance.

20     THE COURT:  I agree.  Document request 26 is granted for

21  the same reason.  Next.

22     MR. BURKE:  31.

23     THE COURT:  That's the same thing.

24     MR. BURKE:  Same thing.  32 is similar as well.

25     THE COURT:  Granted, granted.  And No. 32 --

1    MS. GROH:   Your Honor, if I could clarify --

2    MR. BURKE:   32 we withdraw.  That has to do with the

3  e-mail claim and there is a stay of discovery having to do

4  with the e-mail claim.

5    THE COURT:   All right.

6    MR. BURKE:   35.  35 is a little bit different than 31 in

7  that it has to do with revocation of consent.  For example,

8  somebody has called in to defendant and said "Hey, don't call

9  me," I think that would probably be subsumed in 31 and 26, but

10 this one is a little bit more explicit.

11   THE COURT:   Well, you do, maintain a Do Not Call list,

12 right?

13   MS. GROH:   Currently we do, your Honor, and I don't know

14 the time frame on that, but again, within the class period we

15 don't have any data that would be responsive to this.

16   THE COURT:   Well, you have documents -- you have some

17 documents which list Do Not Call.  You must have some sort of

18 a procedure as to what happens when somebody says "Don't call

19 me," right?

20   MS. GROH:   I'm not sure if it's a written procedure or

21 if it's a --

22   THE COURT:   Well, you're not sure, answer it.  You don't

23 have to create any documents, all you have to do is answer it.

24 And come up with the documents that you have.  Request No. 35

25 is granted.

1      MR. BURKE:  39, your Honor, another arm of what CCH does

2    is they publish legal treatises for compliance with marketing

3    and advertising laws.

4      THE COURT:  I know about CCH.  I used to use them.  They

5    were pretty tough to use when I was in law school.  Maybe

6    they're a lot better now.

7      MR. BURKE:  They're organized by date rather than by

8    subject.  Your Honor, we are asking for anything -- and I

9    think this is included in 25, maybe some of the other

10   requests, but expressly we are asking for their legal

11   treatises and updates that have to do with TCPA compliance.

12     MS. GROH:  And, your Honor, I see no relevance in this

13   whatsoever.

14     THE COURT:  I don't think it's relevant either.  If you

15   want to, look them up.  They're published, aren't they?

16     MS. GROH:  Correct.

17     THE COURT:  These are treatises.  They're published, you

18   can look them up.

19     MR. BURKE:  I haven't been able to find one, your Honor.

20     THE COURT:  Well, so maybe --

21     MR. BURKE:  On eBay, not in the library, not anywhere

22   else.

23     THE COURT:  Well --

24     MR. BURKE:  And we are asking to show knowledge of

25   these -- of the TCPA.

1      THE COURT:  I don't think it's relevant however.

2      MR. BURKE:  Okay.

3      THE COURT:  Their exposition of the law, I don't think

4 that's relevant.

5      MR. BURKE:  Organizational charts of the defendant.

6      THE COURT:  What else -- where are you at?

7      MR. BURKE:  Sorry, Judge.  We are almost done.  Page 14.

8      THE COURT:  Organization charts.

9      MR. BURKE:  Both of personnel and the corporate structure

10 of the defendant.

11     THE COURT:  What's the relevance?

12     MR. BURKE:  Well, as to personnel I want to know where

13 Brian Holbrook, this autodialer guy, where he falls, who his

14 boss is, who works underneath him.

15     THE COURT:  Why don't you ask that specifically.  You

16 want an entire organizational chart for a company that's been

17 in existence a long time and is a large company.  You don't

18 need to know all that, do you?  If you want something specific

19 about specific people that are involved with the autodialer,

20 okay, but --

21     MR. BURKE:  I don't think -- I suspect they're not going

22 to have a chart that just deals with Brian Holbrook, but any

23 chart that includes Brian Holbrook I think would be

24 appropriate.

25     MS. GROH:  Judge, I would agree with you that this is

1    plainly irrelevant and overbroad, and as you stated, this is a

2    large company with a lot of players and personnel --

3        THE COURT:   If you want anything specific, you can ask

4    something specific, but I think this is overly broad and is

5    irrelevant and therefore, that motion is denied.

6        MR. BURKE:   Judge, we don't have an insurance policy from

7    the defendant.

8        MS. GROH:   On this point, your Honor, we were seeking to

9    enter a protective order before disclosing this proprietary

10   business contract with a third-party.

11       THE COURT:   Can I ask you what's proprietary about an

12   insurance policy?

13       MS. GROH:   It's a private contract that is commercial

14   information under Rule 26(c).

15       THE COURT:   It's a private contract.  You have already

16   disclosed what company.

17       MS. GROH:   Pursuant to our Rule 26 obligations, we

18   have --

19       THE COURT:   So --

20       MS. GROH:   -- identified the policy limits --

21       THE COURT:   If somebody wanted to call that company and

22   say "Look, I would like to have a liability policy that covers

23   the following," they would present that policy, wouldn't they?

24   They should be happy with that.  I don't understand what's so

25   proprietary.  Everything these days is proprietary and

1  confidential.  How does it hurt you -- how does a competitor

2  gain an advantage over your liability insurance policy for

3  heaven's sake?

4  　　MS. GROH:　It's our position, your Honor, that it's

5  commercial information that should be protected --

6  　　THE COURT:　Why?

7  　　MS. GROH:　-- from disclosure.

8  　　THE COURT:　Why?  What I'm trying to get at is why.

9  You're not the only one.  The lawyers now, everything is

10  proprietary and everything is confidential.  That isn't the

11  way it's supposed to work.  It's supposed to be secrets that

12  are subject to protective orders, not any other old document

13  that doesn't hurt you competitively.

14  　　Anyway, you're going to work on a protective order.  The

15  motion with regard to the insurance -- produce the insurance

16  policy.  Also, work on your protective order.

17  　　MR. BURKE:　Judge, two more issues remain.  One is that

18  there is no privilege log, but in their papers they said that

19  they're not withholding anything based on privilege, so I

20  think that's a non-issue.

21  　　THE COURT:　Well, so we don't have to visit it.

22  　　MR. BURKE:　And the final issue is an interrogatory that

23  I issued asking for essentially a privilege log of documents

24  that the defendant knows are responsive to the discovery

25  requests but they don't have in their possession, custody, or

1  control.  And I have narrowed that interrogatory to dialer

2  documents.

3      THE COURT:  I don't understand that.  Documents that

4  they know exist, but they do not have any control --

5      MR. BURKE:  I'm asking where they are so I can go get

6  them.

7      THE COURT:  Well, it's not a privilege log.

8      MR. BURKE:  No, it's sort of a log of what they don't

9  have.

10     THE COURT:  It's a list.

11     MR. BURKE:  Yes, it's a list.

12     THE COURT:  A list of --

13     MS. GROH:  Interrogatory No. 7 requests defendant

14  identify all responsive documents that are being withheld on

15  the basis of privilege or an objection.  Defendant answered

16  that to say that there are none.  Somehow plaintiff is still

17  moving to compel on this request.

18     THE COURT:  There are none.

19     MR. BURKE:  Well, I mean, your Honor, for example, there

20  are manuals that were not being produced before today that the

21  defendant was withholding based upon objection of overly

22  burdensome.

23     THE COURT:  But they are going to produce them in

24  accordance with our rulings today.

25     MR. BURKE:  For sure.

1   THE COURT:   Okay.

2   MR. BURKE:   What I'm asking for here, what I wanted was

3   for them to tell me is "Oh, we have got these manuals, but

4   we're not giving them to you because we think it's unduly

5   burdensome."  If there is anything after today that they're

6   not giving me because of some objection, I would like to know

7   what it is.  And if there is something that they don't have

8   custody of --

9   THE COURT:   They have to give you everything they have.

10  If they know where something is and they do not have control

11  over it, ask them that specifically, but you didn't ask them

12  that in this interrogatory.

13  MR. BURKE:   Not specific enough.

14  THE COURT:   Therefore, the motion with regard to that

15  interrogatory is denied.

16  MR. BURKE:   Judge, as to the protective order, this is

17  our last issue.  There are two subjects that were, that the

18  parties are dealing with and I think that if we can resolve

19  them today, the defendant will probably be able to file a

20  motion for protective order.

21  One, I would like to have a sentence in Paragraph 1 that

22  says "Nothing herein shall expand or restrict the scope of

23  materials that may be designated as confidential pursuant to

24  Rule 26 and applicable case law."  The defendant finds that

25  objectionable.

1      MS. GROH:   We have three objections to that, your Honor.

2   Frankly, we wouldn't have a problem if we cut that sentence

3   off at "Nothing herein shall expand or restrict the scope of

4   materials that may be designated as confidential," period.

5   The remaining part of the sentence, however, restricts the

6   designation of confidential materials while the first part of

7   the sentence expands it.  We find that to be contradictory

8   and --

9      THE COURT:   But you still have a provision that says if

10  somebody challenges that, you can go to court and the court

11  can determine that.

12     MS. GROH:   Exactly, which is why we don't think that

13  this provision is necessary because there is a provision later

14  on on how to challenge the designation of a document.

15  Additionally, this "pursuant to Rule 26(c) and applicable case

16  law" is just a vague statement that we find to be unnecessary

17  and unclear.

18     MR. BURKE:   Earlier in the paragraph it says that the

19  defendant or any party -- first it said defendant only -- can

20  make any document that's not previously made available to the

21  public confidential in this case.

22     THE COURT:   All right.

23     MR. BURKE:   I think that's too broad.  I don't see --

24     THE COURT:   Well, then you can challenge -- there is a

25  challenge provision here, isn't there?

1      MR. BURKE:  There is.

2      THE COURT:  So challenge it when the time comes,

3  challenge it.

4      MR. BURKE:  As long as I don't get stuck with some

5  argument that says oh, the law of the case is that any

6  document that wasn't previously disclosed to the public, the

7  order already tells us that it's confidential.  That's what

8  I'm worried about.  And I think that any motion challenging

9  confidentiality, we are going to be arguing Rule 26(c) and

10  applicable case law.

11      THE COURT:  Have the words "subject to the challenge

12  provisions as shown in paragraphs" whatever they are, you can

13  add that, but make it subject to the challenge provisions.

14      MR. BURKE:  And the second issue is that I think that

15  it's appropriate, and I have had this in other protective

16  orders, to have a provision that third parties that seek to

17  use the protective order in subpoena responses subject

18  themselves to the jurisdiction of this court for any disputes

19  or anything else having to do with their subpoenaed responses.

20      THE COURT:  Well, they are anyhow.  They are anyhow.  If

21  you subpoena somebody and they don't want to come up with the

22  documents that you have subpoenaed, you come to court, you ask

23  that they be held in contempt of court.

24      MR. BURKE:  I don't want to have to --

25      THE COURT:  What do you need that for?

1    MR. BURKE:  Well, say, for example, a subpoena issues out

2  of the District of Alaska.

3    THE COURT:   Then you have got to go up to Alaska.  We're

4  not going to circumvent that and say -- first of all, it

5  doesn't bind any of the third parties anyway.  I can make all

6  kinds of orders with regard to that, they didn't agree, and

7  you're saying, well, if they look at it --

8    MR. BURKE:  No, I'm saying if they use the protective

9  order, if they designate materials protected, confidential

10  under this protective order, they're submitting to the

11  jurisdiction of this court with regard to those documents.

12    MS. GROH:   We don't think this language is necessary,

13  your Honor, and think it's overly burdensome to require a

14  third party to submit to the jurisdiction of this court.

15    THE COURT:   I agree.  It's an attempt to circumvent that

16  portion of the Rules that say, that have to do with where

17  disputes as to third-party subpoenas are resolved and I don't

18  think you can do that, and I don't think it's binding upon

19  them at all even if they use it.  Therefore, the order is

20  don't put it in.

21    MR. BURKE:  Very good.

22    THE COURT:   Okay.  You're going to submit a draft order

23  on this.

24    MR. BURKE:  Okay.

25    THE COURT:   All right.  We will circulate it and --

1   submit a draft order.

2        MR. BURKE:  I'm going to also order the transcript.

3        THE COURT:   I think you're going to need to.

4        MR. BURKE:  Okay.

5        THE COURT:   All right.

6        *                    *                    *

7             I certify that the above was transcribed

8             from digital recording to the best of my ability.

9

10                  /s/ Lois A. LaCorte

11        _____        _____

12        Lois A. LaCorte                 Date

13        Official Court Reporter

14

15

16

17

18

19

20

21

22

23

24

25